## THE UNITED STATES COURT OF INTERNATIONAL TRADE

_____

LUTRON ELECTRONICS CO., INC.              )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )
                                          )      Court No.  22-00264
UNITED STATES,                            )
                                          )
                    Defendant.            )
_____)

## COMPLAINT

Plaintiff, Lutron Electronics Co., Inc. (Lutron or Plaintiff), by and through its attorneys, Sandler, Travis & Rosenberg, P.A., alleges as follows:

## PARTIES

1.      Lutron is a family-owned business organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 7200 Suter Road, Coopersburg, Pennsylvania. Lutron develops, manufactures, imports, exports, and sells a wide array of sophisticated electronic and electromechanical lighting control devices and machines. This action concerns Lutron's importation of certain intelligent window shade machines (shade machines" or "machines") comprised of a multitude of electro-mechanical parts and having intelligent and autonomous functionality as described in more detail herein.

2.      The defendant in this case is the United States, through U.S. Customs and Border Protection (CBP or Customs). CBP is responsible for classifying merchandise imported into the United States under the Harmonized Tariff Schedule of the United States (HTSUS) and collecting duties on merchandise.

## THE SUBJECT ENTRIES AND PROTESTS

3.      This action challenges CBP's liquidation of a single entry, Entry No 23160469413, entered on April 7, 2022 and liquidated on June 10, 2022 (The Entry).

4.      Protest No 240122100050, challenging the liquidation of The Entry was timely filed on August 12, 2022, along with a duly mailed request for accelerated disposition pursuant to 19 C.F.R. § 174.22.  On September 9, 2022, CBP denied Lutron's protest.

## JURISDICTION AND STANDING

5.       This action arises under 19 U.S.C. § 1514(a)(2), as amended, to contest CBP's classification and the rate and amount of duties chargeable upon liquidation of Lutron's shade machines as further described herein.

6.      This Court possesses exclusive jurisdiction over this action under 28 U.S.C. § 1581(a) as amended, because the action was commenced to contest the denial of a protest under section 515 of the Tariff Act of 1930.

7.      In accordance with 28 U.S.C. § 2636(a), this action was timely commenced within 180 days after plaintiff's protest was denied by CBP.

8.      Lutron has standing to bring this action pursuant to 28 U.S.C. § 2631(a) because it is the importer of the subject merchandise and the party whose protest, filed under 19 U.S.C. § 1514, against the classification of such merchandise at liquidation was denied by Customs.

9.      All liquidated duties, taxes and fees were paid prior to commencement of this action.

## THE ASSESSMENT AND THE CLAIM

10.      At liquidation, CBP classified and assessed duties on the shade machines under the following subheadings:

Subheading 6303.92.2030:    Curtains (including drapes) and interior blinds; curtain or bed valances: Other: Of synthetic fibers: Other: Window shades and window blinds

Subheading 3925.30.1000:    Builders' ware of plastics, not elsewhere specified or included: Shutter, blinds (including venetian blinds) and similar articles and parts thereof: Blinds

In addition, CBP assessed certain of the shade machines at issue with additional duties pursuant to Section 301 under subheading 9903.88.15, HTSUS.

11.    The shade machines are not classifiable under either heading 6303 or heading 3925, HTSUS, because they exceed the scope of both provisions and are properly provided for elsewhere in the tariff schedule.

12.    The shade machines are properly classified under subheading 8479.89.95, HTSUS, which provides for "machines and mechanical appliances having individual functions, not specified, or included elsewhere in this chapter: …[o]ther machines and mechanical appliances:… other:… other" at a duty rate of 2.5 percent *ad valorem*.

13.    Additionally, because the origin of each shade machine at issue is Mexico, none is subject to Section 301 duties under Heading 9903, HTSUS.

## BACKGROUND

14.    Lutron was incorporated in 1961 by American Inventor Joel Spira and his wife Ruth, based on Mr. Spira's invention of the first commercially viable solid state electronic dimmer. Since that time, Lutron has invented hundreds of lighting control devices, systems, and machines and has become a market leader in high-quality lighting controls for all sources of light including fluorescent, incandescent, halogen incandescent, magnetic low-voltage, electronic low-voltage, LED, and natural.

15.    In the mid-1980s Lutron set out to create an electro-mechanical machine that would

3

enable users to control various aspects of their interior environment by moderating natural light through the autonomous and intelligent operation of a panel. Over the next several years Lutron spent 50-100 person-years and tens of millions of dollars developing such a machine, launching its first shade machine in 1993. The original shade machines consisted of rollers that would be affixed to the top and bottom of a window and a scroll of panel material. The panel material consisted of a combination of open, sunscreen, and blackout panels. The microprocessor controlled the custom motor drive assembly in the top roller to precisely position the panel to achieve the desired effect.

16.     Like the shade machines at issue, Luton's first shade machines were comprised of multiple parts including tubes, motors, processors, gearing and panels. Additionally, like the shade machines at issue, the original shade machines were designed to interface with various other devices and operate as part of a complete system that could intelligently and autonomously moderate various light sources, ultraviolet rays, heat gain/loss, and electricity consumption in an interior space through the autonomous manipulation of a panel in response to the environment, user preferences, and/or programming.

17.     Since launching its original shade machines, Lutron has spent tens of millions of dollars in additional research and development costs and hundreds of additional person-years to improve the shade machines' electronic and mechanical parts in order to enhance the user's automated experience. For example, Lutron was able to shrink the shade machines' electronic and mechanical parts, enable the machines to function near silently, add additional wireless functionality, and offer optional internal batteries.

18.     The shade machines at issue were manufactured in Mexico from parts of various origins.

19.     Manufacturing the shade machines is a complex, multi-step process which includes

but is not limited to the manufacture of finished printed circuit boards (PCBs) from blank PCBs and various electronic components, two separate microprocessor flash programming procedures, precision cutting and finishing of materials including the tubes, hembars and panels, and the precision assembly of a multitude of parts including the electronic drive unit (EDU). Every shade machine must also undergo significant quality control testing at multiple stages of manufacture to ensure correct functioning. Indeed, all shade machines are tested at the PCB level, EDU level , and then again at the finished product level.

20.     The manufacturing process requires a multitude of highly trained and skilled technicians, a temperature and humidity-controlled environment, and millions of dollars in specialized equipment and machinery.

21.     Lutron's shade machines are, or have been, covered by over 35 U.S. patents including Nos. 7,281,565 "system for controlling roller tube rotational speed for constant linear shade speed"; 7,537,040 "control system for uniform movement of multiple roller shades"; 9,598,901 "quiet motorized window treatment system"; 9,890.587 "drive assembly for a motorized roller tube system"; 7,931,068 "motorized shade control system"; and 6,497,267 "motorized window shade with ultraquiet motor drive and ESD protection."

22.     Because they are complex electro-mechanical machines, the shade machines are certified in the United States by Underwriters Laboratory (UL) to comply with ANSI/UL Safety standard 325 which applies to motorized gates, windows, and other opening and closing appliances. The machines are also certified by the FCC to comply with 47 CFR § 15.231 covering "Periodic operation [of intentional radiators] in the band 40.66-40.70 MHz and above 70 MHz." Finally, the machines comply with National Electric Code, NFPA 70 which is the benchmark for safe electrical design, installation, and inspection to protect people from electrical hazards.

23.     The shade machines are an integral part of Lutron's total solution to controlling

natural light and can link with proprietary software like Lutron's Hyperion solar adaptive software. Lutron's Hyperion software automatically adjusts Lutron's shade machines throughout the day in response to changing positions of the sun, saving energy and reducing glare and heat gain.

24.     The shade machines are designed to be linked to Lutron energy saving controls such as thermostats, daylight sensors, and occupancy sensors to create a highly advanced integrated electric and electromechanical system. The shade machines can also be paired with third party home/building automation devices such as voice operated digital assistants and audio/visual systems.

25.     The shade machines are also operable to provide security functionalities as part of Lutron systems and third-party security systems. For example, the shade machines have built-in programming which works in conjunction with Lutron's proprietary software to allow for the shade machines to automatically raise or lower the shades or to lock out control of the device at the touch of a button in emergency situations. The shade machines can also be linked to third-party home security systems such as burglar alarms. When the security alarm is activated, the shades can be configured to all automatically open and the wall controls can be locked by the system to ensure the shades remain open, thus making any intruder more visible from the outside of the home. The machines also have built in programming to allow for "Away" and 'Vacation" modes as part of such systems. The "Away" mode allows the homeowner to set the house to "lights off, shades down" when away from home each day and "Vacation" mode which simulates the homeowners being home when they are away on a longer-term basis.

26.     The shade machines at issue are comprised of multiple parts including:

- Motors
- Printed Circuit Boards (PCB) including:
  - Communications circuit (either wired or wireless)
  - Motion control circuitry and related components including ring magnet and sensors,

- o Microcontroller
- o Non-volatile memory
- o Power circuitry
- First stage gears
- Second/Third stage gears
- Output shaft and puck
- Idlers
- Mounting bracketry
- Tubes (aluminum, carbon-fiber, or hybrid carbon fiber laminated-over-aluminum)
- Panels (fabric or plastic),
- Hembars (aluminum or steel)
- Mandrels

Certain models may also contain:
- Brakes
- Energy storage springs
- Lineals/fascia
- Batteries
- A wire harness and connector for low voltage DC power input for an external wire
- Additional non-motorized rollers with panels, couplers, and bracketry for coupling with the associated primary machine

27.    Each part of the shade machine has a defined function with all parts working together to accomplish a specific task, *i.e.* the intelligent and autonomous control of various aspects of an interior space including visible light, ultraviolet rays, electricity consumption, heat gain/loss, mood, privacy, and security etc.

28.    The mandrel, motor, PCB and related components, gearing, output shaft, puck and in certain models the brake, are combined to create the shade machine's Electronic Drive Unit (EDU) (also referred to as Quiet Electronic Drive (QED)). The EDU is situated inside of the high strength tube and provides the mechanical force required to rotate the tube. The puck and the tube fit together through a combination of an interference and sliding clearance fit. The fabric or plastic panel part of the machine is attached to the tube and the hembar is attached to the base of the panel.

29.    Each part of the shade machine is meticulously designed and engineered down to

its constituent material to ensure proper functioning. For example, various parts including the brackets, idler, and tube must be made from conductive materials in order to allow the electrostatic charge that can be built up in the panel to dissipate via a safe route that does not impact the function of the sensitive on-board electronic components of the machine. Often this involves using plastic compounds with specific percentages of metallic fibers mixed in to promote the correct degree of conductivity.

30.     The shade machines are equipped to be controlled through the use of wireless hand-held remotes, wired or wireless keypad controls, a central processor, a computer, or other smart devices like a smartphone. When coupled with a smartphone, the shade machine can be monitored and controlled remotely via a secure cloud-based connection from anywhere around the world.

31.     The shade machine can receive commands in a variety of ways including users pressing buttons on hand-held remotes or keypads, programmed timeclock events, and autonomously from sensors monitoring environmental conditions (such as brightness, occupancy, temperature, etc.). Once a command is received, the EDU automatically adjusts the panel by activating the patented precision motor and gearing. The EDU monitors the rotation of the motor drive shaft that is ultimately coupled to the panel via a patented gearbox and brake system.  The motor drive shaft rotational position is tracked by a pair of hall-effect sensors mounted on the circuit board within the EDU of the machine. The hall effect sensors detect the presence and direction of magnetic fields and convert this information into electrical signals. The motor drive shaft is mounted with a segmented magnet with a series of north and south poles. As the poles of the magnet spin by the hall effect sensors, the electrical signals generated are fed into the microprocessor on the EDU. The rate at which these signals change is proportional to the motor drive shaft speed and therefore also proportional to the linear speed of the panel, accounting for

8

the effect of known gear ratios and panel roll-up on the tube. The sequential order of the signals provides information regarding the direction of travel. Because the rotational speed of the motor is directly and mathematically related to the panel motion and the number of segments on the magnet are known (as Lutron's engineers have designed and specified all the electrical and mechanical components in the EDU), the exact position of the panel is known with great accuracy. Effectively, each count of the signals from the hall effect sensors represents a precise amount of movement for the panel. This information is stored, retrieved, and operated on mathematically in real time by custom designed and written proprietary software running on the microprocessor located in the EDU; this provides very smooth and uniform motion, as sudden stops and starts are eliminated and the motion of the hembar and panel is extremely consistent, even across multiple linked shade control machines.

32.     The shade machines cannot be operated manually, either through the use of a pull chain or cord or through any other physical manipulation of the panel.

33.     The shade machines are in continuous operation through ongoing communication with the overall Lutron system to receive or transmit information. For example, the machines are constantly "listening" for system signals requesting panel movement or requests to report information including panel position, internal temperature or humidity, voltage, link status, faults, performance information, high-torque situations caused by obstructions or drag, battery status, or for firmware upgrades to allow improvements and new functionality to be deployed after purchase.

34.     Lutron's shade machines are marketed and advertised based primarily on their intelligent and automated features including:

**Quiet Precision Control**

•     Ultra-quiet operation using its patented precision motor and gearing
•     Sophisticated electronics featuring integrated circuits, processor, on-board
•     memory, and two-way communication

- A proprietary motor with a patented multi-stage custom gearbox and a mechanical braking system
- Uniform precision movement including coordinated movement with other devices in the system using its patented on-board intelligent processor and electronics
- Patented technology for full closed loop absolute position sensing to ensure hembar position within 1/16"or 1/8" depending on machine type
- Patented technology for constant velocity movement of the hembar, corrected for fabric thickness, tube diameter, and fabric roll up

**System Operation and Integration**

- Patented wired / wireless communication of system and unit data.
- Patented communication technology providing one-touch control from keypads or remotes with fast response times
- Designed to operate and integrate into other advanced systems
- Patented technology for providing absolute position information back to smart devices
- Remote access to system operation and parameters.

**Additional EDU features**

- Unit mounted status indicators as well as remote monitoring available through system interface and smart devices such as iPhone
- On-board historical data logging of motion, temperature, cycle count, system faults, which permit troubleshooting in the field as well as returned unit analysis to help Lutron continually improve the shade machines

**Battery Optimization & Replacement Ease**

- Patented battery conservation techniques in battery-powered shade machines
- Patented designs allow for simple battery compartment access and battery replacement

35.     Generally, the shade machines are substantially more expensive than a manual shade or blind.

36.     Consumers purchase and pay a premium for Lutron's shade machines over manual or motorized shades because of their intelligent and automated features which allow for intelligent and autonomous control over an interior environment.

37.     Each shade machine is custom manufactured to order and specifically designed for

the user's intended application. Depending on the user's application, machines will have varying motors, gearing, brakes, tube length, width and strength, and programming. For example, a machine configured for a wider window may require a carbon fiber tube rather than an aluminum tube in order to provide sufficient stiffness to mitigate excessive tube deflection, which in turn provides for proper and consistent roll-up performance. Additionally, wider machines may require more powerful EDUs and/or spring assist mechanisms to ensure mechanical capability and/or battery efficiency.

38.     Lutron's shade machines must be ordered through a proprietary engineering-based computer program. When ordering, a customer must input desired criteria including width, height, manner of hanging *i.e*., inside window frame, outside window frame etc., battery or wired, and desired panel. The computer program will then determine whether the machine will function appropriately as specified. If the machine would function appropriately, the program then determines the specific components necessary to build the machine including the proper motor, tube, programming etc. The program also provides useful machine-related outputs like how many batteries a battery powered machine will require, the type of battery life the customer can expect with the specified configuration and provide suggestions to "boost" the battery configuration with a higher battery life estimation. Should the program determine that, based upon the customer's desired criteria, the machine would not function appropriately, the program will direct consumers to substitute choices.

39.     Approximately 95 percent of Lutron's shade machines are sold and installed by Lutron trained professionals rather than by a consumer due to the precision required in installation and the required machine programming.

40.     The cost of the shade machine's electromechanical and mechanical components account for a majority of the total cost of the shade machine as imported.

11

41.     The shade machines are made using only panel materials that have been approved for such use by Lutron.

42.     Prior to inclusion on a shade machine, panel materials must undergo dozens of tests tracking forty-five different material characteristics to ensure the material will perform properly as part of a finished machine.

## CUSTOMS RULING LETTER NY N010048

43.     On April 19, 2007, Plaintiff's counsel filed an amended Administrative Ruling Request with CBP seeking a tariff classification ruling on two Lutron shade machines including machines substantially identical to those at issue as well as a drapery track system.  Shade machines and drapery track systems are substantially similar. Where shade machines adjust a panel through vertical movement, the drapery track systems, comprised of an EDU, drapery track, and associated hardware, intelligently and autonomously adjust a panel or drapery through horizontal movement.

   a.  The Amended Ruling Request explained, in relevant part, that the shade machines and drapery track systems were part of Lutron's "total solution to natural and man-made lighting control, which links shades, dimmers, ballasts, and other energy-saving controls."

   b.  The Amended Ruling Request listed all parts comprising the shade machines including "fabric shades, hembars, one or more quiet drive units or QED, roller tubes, roller bulk idlers, brackets, and associated hardware."

   c.  The Amended Ruling Request listed all parts comprising the drapery track systems including "one or more QEDs, drapery tracks, brackets, and associated hardware."

   d.  The Amended Ruling Request contained an extensive discussion of the function and use of the shade machines and drapery track systems including an explanation that both "attenuate light penetration while preserving exterior views, controlling heat gain, and minimizing UV damage ...."

   e.  The Amended Ruling Request explained that both systems are electronically programable and can be controlled with handheld remotes and keypads.

f. The Amended Ruling Request made clear that the shade machines were imported with their respective panels. In fact, in questions submitted to Lutron by CBP prior to issuance of the ruling, CBP stated "The shading system is said to include the fabric shade at the time of importation."

g. The Amended Ruling Request made clear that the drapery track systems were imported without their respective drapes.

44. On May 3, 2007, CBP issued NY N010048 CBP stating, in part:

The controllable shading and drapery track systems are used for commercial and residential applications. The systems aid in reducing glare, protecting furnishings from U/V damage, and maximizing HVAC efficiency. The settings of both systems are electronically programmable so that window treatments can be programmed to stop at preset positions. The systems can also be equipped to receive infrared control signals and may be controlled by hand-held remotes in addition to the keypad controls. As you indicate in your letter, the track systems will be complete at time of importation from Mexico. The complete controllable shading systems consist of fabric shades, hembars, one (or more) quiet electronic drive units ("QEDs"), roller tubes, roller bulk idlers, brackets, and associated hardware. The complete drapery track systems consist of one or more QEDs, drapery tracks, brackets, and associated hardware. Drapes are not included at time of importation.

The applicable subheading for the complete controllable shading and drapery track systems will be 8479.89.9897, Harmonized Tariff Schedule of the United States (HTSUS), which provides for machines and mechanical appliances having individual functions, not specified or included elsewhere in chapter 84: other machines and mechanical appliances: other: other: other: other. The rate of duty will be 2.5 percent ad valorem.

45. In NY N010048, CBP determined that both Lutron's shade machines imported with panels **AND** the drapery track systems imported without drapes were classifiable under heading 8479, HTSUS, as "machines and mechanical appliances".

46. NY N010048, mentions neither General Rule of Interpretation 3(b) nor "essential character."

47. Lutron entered and CBP liquidated shade machines in accordance with NY N010048 for nearly 15 years.

**CUSTOMS RULING LETTER NY N013565**

48. On July 24, 2007, CBP issued NY N013565 regarding the classification of Lutron's

EDU/QED when imported separately:

> You state that the quiet electronic drive units (QEDs) are used in controllable shading and drapery track systems. The systems aid in reducing glare, protecting furnishing from U/V damage, and maximizing HVAC efficiency. The settings are electronically programmable so that the window treatments can be programmed to stop and preset positions. The systems can also be equipped to receive infrared control signals and may be controlled by hand-held remotes in addition to keypad controls.

> The literature included with your submission states that the QED consists of an intelligent processor that allows for the programmability of the controllable shading or drapery track system and an electronic drive assembly. The systems also include one or more keypad controls which receive user's input. Since the settings of both systems are electronically programmable, the QEDs can be programmed to stop the window treatments at preset positions. The QEDs also contain helical gearing motors to ensure ultra-quiet operation.

> The applicable subheading for the QEDs will be 8479.90.9496, Harmonized Tariff Schedule of the United States (HTSUS), which provides for machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter; parts thereof: parts: other: other. The rate of duty will be free.

49. When imported separately, Lutron's EDUs are classifiable as parts of machines and mechanical appliances under Heading 8479, HTSUS, pursuant to NY N013565.

## CUSTOMS RULING LETTER HQ H312768

50. On January 26, 2022, CBP published Customs Ruling HQ H312768, modifying Customs Ruling NY N010048, stating:

   a. The shade machines were made up of various components including fabric shades, hembars, one (or more) QEDs, roller tubes, roller bulk idlers, brackets, and associated hardware.

   b. Lutron's shade machines were composite goods within the meaning of the General Rule of Interpretation 3(b).

   c. The shade machines were classifiable in accordance with the component which provided the essential character.

   d. The QED (also known as the EDU) "component" was classifiable under Heading, 8479, HTSUS, which covers machines and mechanical appliances.

14

    e.   The shade "component" was classifiable under Heading 6303, HTSUS, which provides for 'curtains (including drapes) and interior blinds; curtain or bed valances."

    f.   The shade component provided the essential character of the shade machines because the shade "protects a space from sunlight and provides privacy," and therefore the machines were "classified under heading 6303, HTSUS, which provides for 'curtains (including drapes) and interior blinds; curtain or bed valances.'"

    g.   "The controllable drapery track system did not include the drapes at the time of importation and remains classified under heading 8479, HTSUS."

51.    HQ H312768 cites no change in law or precedential court decision as a basis for CBP's modification of N010048.

52.    HQ H312768 became effective on March 27, 2022.

53.    HQ H312768 did not modify or revoke NY N013565 and therefore an EDU, when imported separately and used for the exact same purpose, is classifiable as a part of a "machine or other mechanical appliance" under Heading, 8479, HTSUS.

54.    Pursuant to HQ H312768, if imported without their panel part, Lutron's shade machines are still classifiable as a "machine or mechanical appliance" under Heading 8479, HTSUS.

55.    As a result of Ruling HQ H312768, the complete shade machines incorporating their panel parts, entered under cover of the subject entries, were misclassified by CBP. Additionally, as a result of Ruling HQ H312768, the textile rules of origin set forth in 19 C.F.R. 102.21,  were applied to certain of the shade machines thus subjecting them to Section 301 duties.

**CAUSE OF ACTION**

**COUNT I- THE SHADE MACHINES ARE CLASSIFIABLE UNDER HEADING 8479 PURSUANT TO GRI 1**

56.    Plaintiff hereby incorporates and alleges paragraphs 1 through 55 as if fully set

forth herein.

57.     Merchandise imported into the United States is classified under the HTSUS. Tariff classification is governed by the principles set forth in the General Rules of Interpretation (GRI) and, in the absence of special language or a context that requires otherwise, by the Additional U.S. Rules of Interpretation.

58.     "The GRIs are to be applied in numerical order, such that if the proper classification is achieved through a particular GRI, the remaining successive GRIs should not be considered." *Starkist Co., v. United States*, 2022 WL 945663 (Fed. Cir. 2022).

59.     GRI 1 of the HTSUS states, in relevant part, that "classification shall be determined according to the terms of the headings and any relevant section or chapter notes" and requires that classification be determined first according to the terms of the HTSUS headings and any relative section or chapter notes.

60.     Absent contrary legislative intent, tariff terms are to be construed according to their common meaning and commercial meaning which are presumed to be the same. *Starkist Co., v. United States*, 2022 WL 945663 (Fed. Cir. 2022).

61.     It is well settled that under a GRI 1 analysis, headings can only be compared to other Headings and not subheadings.

62.     "[W]hen an imported article is described in whole by a single classification subheading, then that single classification applies, and the successive GRIs are inoperative." *Starkist Co., v. United States*, 2022 WL 945663 (Fed. Cir. 2022)

63.     Pursuant to GRI 2(a), a reference in a heading to an article also includes a reference to that article entered in an unassembled condition.

### a. The Shade Machines Are Described By Heading 8479, HTSUS, In Their Entirety

64.     Heading 8479 provides for "machines and mechanical appliances having individual functions, not specified or included elsewhere in chapter 84."

65.     The shade machines fit within the common meaning of the tariff term "machines and mechanical appliances" because they apply mechanical force, are comprised of multiple parts each with a defined function, each working together to produce a result. *See e.g. Applikon Biotechnology, Inc. v. U.S.*, 35 C.I.T. 1718 (2011).

66.     The tariff contains no language limiting the constituent materials that can make up a machine or mechanical appliance classifiable under Heading 8479.

67.     The scope of the terms of the headings, section, and chapter notes may be aided by reference to the World Customs Organization Harmonized Description and Coding System Explanatory Notes (ENs) which constitute official interpretations of the Harmonized Tariff System at the International level. While not legally binding or dispositive, the ENs provide a commentary on the scope of each heading of the HTSUS and are therefore useful in ascertaining the proper classification of merchandise.

68.     The EN to (I)(B) to Section XVI, states, in relevant part:

> (B)     In general, the goods of this Section **may be of any material.** In the great majority of cases, they are of base metal, but the Section also covers certain machinery of other materials (e.g., pumps wholly of plastics) and parts of plastics, of wood, precious metals, etc. [emphasis added].

69.     The phrase "any material" in the relevant ENs includes fabric or plastic and CBP has classified machines containing fabric or plastic, including, for over a decade, Lutron's shade machines, under Heading 8479, HTSUS.

70.     For example, in NY B87749 (Aug. 7, 1997), Customs determined that the

classification of an "oil spill containment system" which was comprised of "an aluminum crane and a mechanically expandable oil containment unit mounted on a float." The containment unit featured "an inner stainless-steel mechanism weighing approximately 75 pounds to which is attached a fabric curtain weighing about 50 pounds." CBP determined that the crane was classifiable as a crane and that the containment unit itself was properly classified under subheading 8479.89.97, as a machine or other mechanical appliance.

71.    The plain language of Heading 8479, HTSUS, therefore includes within its scope all machines and mechanical appliances of whatever material and is only limited by individual functions, *i.e*., they must have individual functions not listed elsewhere in chapter 84.

72.    The shade machines have individual functions that are not specified elsewhere in Chapter 84, *i.e*., the control of various aspects of an interior space including visible light, ultraviolet rays, electricity consumption, heat gain/loss, mood, privacy, and security through remotely controlled and intelligent and autonomous manipulation of a panel. The shade machines can also control the exterior aesthetics of home or building providing for a uniform appearance from outside of the structure.

73.    The shade machines are *prima facie* classifiable in their entirety under Heading 8479, HTSUS, whether imported fully assembled or, as in the case of shade machines consisting of a primary machine with coupled non-motorized rollers and panels, disassembled.

      **b.  The Shade Machines Are Not Classifiable In Their Entirety Under Either Heading 3925 Or Heading 6303**

74.    Heading 3925, HTSUS, provides for "builders' ware of plastics, not elsewhere specified or included" while Heading 6303, HTSUS, provides for "curtains (including drapes) and interior blinds; curtain or bed valances."

75.    The tariff heading language "builders' ware of plastic" does not describe the

window shade machines in any meaningful way.  Although the tariff term "blinds" can be found in subheading 3925.30.10, HTSUS, it is well settled that headings must be construed without reference to their subheadings.

76.     The term "interior blinds" in Heading 6303, HTSUS, is *eo nomine* as it lists an item by a specific name.

77.     When an article possesses features substantially in excess of those within the common meaning of an *eo nomine* term, it is not properly classified in the *eo nomine* provision. *Camelbak Products, LLC v. United States*, 649 F.3d 1361, 1365 (Fed. Cir. 2011).

78.     Lutron's shade machines have features and functions substantially in excess of the Common meaning of "interior blinds" including but not limited to the ability to function as part of an entire control system, enhance a home's security, automatically respond to environmental factors and time clock events, monitor the temperature and humidity inside the machine to ensure proper functioning, and even accept firmware updates.  Therefore, the shade machines do not fit within the *eo nomine* tariff term "interior blinds."

79.     Even if the term "interior blinds could be construed to describe some part of the subject merchandise, the tariff term does not describe Lutron's shade machines in their entirety.

80.     Indeed, in HQ H312768, CBP stated "the subject merchandise is not classified by application of GRI 1 in heading 6303, HTSUS…".

81.     The shade machines are not *prima facie* classifiable in their entirety under either Heading 3925 or 6303.

### c.   CBP Impermissibly Applied GRI3(b)

82.     "The mere fact that a piece of merchandise consists of more than one item or article

does not necessarily make that merchandise a 'set' or a 'composite' good subject to classification under GRI 3(b)." *The Pomeroy Collection, LTD. V. United States*, 32 C.I.T. 526 (Ct. Int'l Trade 2008).

83.    GRI 3(b) "only applies if no provision exists in the Harmonized System that provides for the set [or composite good] as a whole." *The Pomeroy Collection, LTD. V. United States*, 32 C.I.T. 526 (Ct. Int'l Trade 2008).

84.    Heading 8479, HTSUS, provides for the shade machines in their entirety while Headings 3925 and 6303, HTSUS, do not.

85.    Because HTSUS Heading 8479 is the only Tariff Heading that provides for the shade machines in their entirety, the machines are classifiable thereunder pursuant to GRI 1.

## COUNT II-ALTERNATIVELY, THE SHADE MACHINES ARE CLASSIFIABLE UNDER HEADING 8479 PURSUANT TO GRI 3(a)

86.    Plaintiff hereby incorporates and alleges paragraphs 1 through 55 as if fully set forth herein.

87.    If the classification of Lutron's shade machines is not determined in accordance with GRI 1, HTSUS, by reference to the applicable HTSUS Headings, Subheadings, Section or Chapter Notes, then classification according to GRI 3(a) is required.

88.    GRI 3 provides that when goods are *prima facie* classifiable under two or more headings, classification shall be determined based upon GRI 3(a)-3(c).

89.    GRI 3(a) provides, in relevant part, that "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description."

90.    In *Orlando Food Corp. v. U.S.* 140 F.3d 1437, 1441 (Fed. Cir. 1998) and *Well Luck Company, Inc., v. United States*, 887 F.3d 1106 (Fed Cir. 2018), the Court of Appeals for the Federal Circuit explained that, under the rule of relative specificity in GRI 3(a), the tariff

subheading with requirements more difficult to satisfy will prevail and be applied over a more general subheading because it describes the article with the greatest degree of accuracy and certainty.

91.     "Goods in trade generally appear in the Harmonized System in categories or product headings beginning with crude and natural products and continuing in further degrees of complexity through advanced manufactured goods." What Every Member of the Trade Community Should Know About: Tariff Classification CBP Informed Compliance Publication.

92.     Headings 8479, HTSUS, covers complex merchandise: "machines and other mechanical appliances" and is more difficult to satisfy than Headings 3925 or 6303, which both cover more simplistic merchandise.

93.     To fit within the common meaning of the tariff term "machine and other mechanical appliance," imported merchandise must consist of an apparatus that uses or applies mechanical power, having several parts, each with a defined function and together performing a particular task. In contrast, to fit within Heading 3925, an item must simply be a plastic "ware" used by a builder and to fit within Heading 6303, an item can simply consist of a panel of cloth for covering a window or even a bed.

94.      Heading 8479 provides the best description of Lutron's shade machines because as a whole, they consist of an apparatus that applies mechanical power, have several parts including panels, each with a defined function which work together to perform a task. To fit within Headings 3925 or 6303, an article requires none of these characteristics.

95.     Lutron's shade machines are properly classified under Heading 8479, HTSUS, by application of GRI 3(a).

**COUNT III-ALTERNATIVELY, THE SUBJECT SHADE MACHINES ARE
CLASSIFIABLE UNDER HEADING 8479 PURSUANT TO GRI 3(b)**

96.     Plaintiff hereby incorporates and alleges paragraphs 1 through 55 as if fully set
forth herein.

97.     If the classification of Lutron's shade machines is not conclusively determined by
GRI 1 or GRI 3(a), then classification according to GRI 3(b) is required.

98.     GRI 3(b) provides as follows: "Mixtures, composite goods consisting of different
materials or made up of different components, and goods put up in sets for retail sale, which cannot
be classified by reference to 3(a), shall be classified as if they consisted of the material or
component which gives them their essential character, insofar as this criterion is applicable."

99.     The explanatory Notes to GRI 3(b) state that "[t]he factor which determines
essential character will vary by the nature of the material or component, its bulk, quantity, weight,
or value, or by the role of a constituent material in relation to the use of the goods."

100.    In HQ H312768, Customs stated that "[I]n NY N010048, CBP determined that the
essential character of the controllable shading systems was imparted by the QEDs." The EDU
(formerly "QED") of the subject shade machines plays a principal role in relation to the use of the
goods as automated machines as designed and intended.

101.    The cost of the subject machines' mechanical and electromechanical
components account for a majority of the total cost of the shade machines as imported.

102.     Consumers pay a significant premium for Lutron's shade machines due to
the presence of the EDU with its sophisticated electronics, patented precision motor, patented
multi-stage gearbox and mechanical braking system and the automated and intelligent and
automated functionality they provide. Panel choice is a secondary consideration.

103.    Though the panel materials must meet Lutron's stringent quality control

requirements, the panel materials are not specifically designed for Lutron, can vary between machine, and generally, do not constitute the majority of the value of the complete item.

104.    The Lutron shade machines are properly classified under Heading 8479, HTSUS, by application of GRI 3(b) because the EDU provides the essential character of the shade machines.

## COUNT IV-ALTERNATIVELY, THE SUBJECT SHADE MACHINES ARE CLASSIFIABLE UNDER HEADING 8479 PURSUANT TO GRI 3(c)

105.    Plaintiff hereby incorporates and alleges paragraphs 1 through 55 as if fully set forth herein.

106.    If the classification of Lutron's shade machines is not determined in accordance with GRI 1, 3(a) or 3(b), then classification according to GRI 3(c) is required.

107.    GRI 3(c) provides as follows: "when goods cannot be classified by reference to 3(a) or 3(b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration.

108.    Heading 8479 occurs in numerical order after Headings 3925 and 6303.

109.    The Lutron shade machines are therefore properly classified under Heading 8479, HTSUS, by application of GRI 3(c).

## COUNT V-NONE OF THE SHADE MACHINES AT ISSUE IS SUBJECT TO SECTION 301 DUTIES BECAUSE THEIR COUNTRY OF ORIGIN IS MEXICO

110.    Plaintiff hereby incorporates and alleges paragraphs 1 through 55 as if fully set forth herein.

111.    Section 301 duties could only apply to the subject shade machines if the country of origin was China.

112.    The shade machines classified at liquidation by CBP under Heading 6303 were

determined to be of Chinese origin based upon the textile rules of origin included in Section 334 of the Uruguay Round Agreements Act, 19 U.S.C. §3592, and the Treasury Regulations promulgated pursuant thereto, 19 CFR §102.21, as applied to merchandise of Heading 6303.

113.    Because none of the shade machines is classifiable under Heading 6303, but rather Heading 8479, the textile rules of origin are not applicable.

114.    The shade machines are manufactured in Mexico by highly trained and skilled technicians through a complex and multi-stage process which substantially transforms components of various origins to a finished machine of origin Mexico and Section 301 duties are not applicable.

115.    Indeed, those shade machines at issue that were classified at liquidation by CBP under Heading 3925, were not subject to the fabric rules of origin and thus were entered and liquidated by CBP as country of origin, Mexico.

## REQUEST FOR JUDGMENT AND RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment overruling the Port Director's denial of Plaintiff's protests and ordering Customs to reliquidate the subject entries at the rate, origin, value, and amount of duty asserted by the importer of record in its protests with a refund of duties, plus interest as appropriate. Plaintiff also requests such other and further relief as the Court deems appropriate and just.

Respectfully submitted,

**SANDLER, TRAVIS & ROSENBERG, P.A.**
*Attorneys for Plaintiff*
675 Third Avenue, Suite 1805-06
New York, New York 10017
Telephone: (212) 549-0137

By:____/s/ Jason M. Kenner____
       JASON M. KENNER

Dated: September 13, 2022
        New York, New York

24