## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: RICHARD K. EATON, JUDGE**

| | | |
|---|---|---|
| LUTRON ELECTRONICS CO., INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Court No.  22-00264 |
| | ) | |
| v. | ) | **NON-CONFIDENTIAL** |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-0160
lmathers@strtrade.com
*Attorneys for Plaintiff*

Dated: April 30, 2026

**TABLE OF CONTENTS**

QUESTIONS PRESENTED.................................................................................................... 3

COMPETING TARIFF PROVISIONS ................................................................................... 3

BACKGROUND ..................................................................................................................... 3

    I.    Lutron, a Technology Company Originally Focused on Lighting Solutions, Developed the First Autonomous Shade Machine, and Improved it With Over Four Decades of Research and Development ................................................................................................................... 3

    II.    The Autonomous Shade Machines at Issue Consist of Various Electromechanical Components, Including EDUs—the Centerpieces of the Machines that Control Their Operation .......................................................................................................................... 6

    III.    After Section 301 Duties are Imposed on Textiles, Customs Upends its Prior Ruling Classifying Lutron's Shade Machines as Machines and Reclassifies Them as Textiles.......... 13

SUMMARY OF ARGUMENT ............................................................................................. 14

ARGUMENT ......................................................................................................................... 16

    I.    Standard of Review.................................................................................................... 16

    II.    Pursuant to GRI 1, Lutron's Shade Machines are Classifiable as "Machines" or "Mechanical Appliances Having Individual Functions" of Heading 8479 .............................. 18

        A.    Lutron's Shade Machines are "Machines" or "Mechanical Appliances"—They are Electromechanical Devices that, Through Their EDUs, Intelligently and Autonomously Retract and Deploy a Panel to Control an Interior Environment.......................................... 18

        B.    Lutron's Shade Machines are "Not Elsewhere Specified or Included" in Chapter 84 ..................................................................................................................... 22

        C.    Lutron's Shade Machines Cannot be Classified as "Curtains," "Drapes," or "Interior Blinds" of Heading 6303 Because They are not Merely Textile Articles—as Customs Rightly Concedes ................................................................................................................ 23

    III.    Even if Resorting to GRI 3 Were Necessary, Lutron's Shade Machines Would Still be Properly Classified under Heading 8479 ................................................................................ 25

        A.    Under GRI 3(b), the EDUs Impart the Essential Character of the Shade Machines—not the Panels ..................................................................................................................... 25

        B.    Even if the EDUs and Panels Were Equally Essential, GRI 3(c) Would Require Classification Under Heading 8479 .................................................................................... 32

CONCLUSION...................................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*ADC Telecomms., Inc. v. United States*,
916 F.3d 1013 (Fed. Cir. 2019) ................................................................................ 16

*Alcan Food Packaging (Shelbyville) v. United States*,
771 F.3d 1364 (Fed. Cir. 2014) ................................................................................ 26

*CamelBak Prods., LLC v. United States*,
649 F.3d 1361 (Fed. Cir. 2011) ................................................................................ 24

*Conair Corp. v. United States*,
29 C.I.T. 888 (2005) ............................................................................................. 3, 27

*Cyber Power Sys. (USA) Inc. v. United States*,
560 F. Supp. 3d 1347 (Ct. Int'l Trade 2022) ........................................................... 31

*Drygel, Inc. v. United States*,
541 F.3d 1129 (Fed. Cir. 2008) ................................................................................ 17

*Gerson Co. v. United States*,
898 F.3d 1232 (Fed. Cir. 2018) ................................................................................ 18

*Home Depot U.S.A. Inc. v. United States,*
491 F.3d 1334 (Fed. Cir. 2007) .......................................................................... 26, 30

*Home Depot U.S.A., Inc. v. United States*,
435 F. Supp. 3d 1311 (Ct. Int'l Trade 2020) ....................................................... 26, 27

*Home Depot USA, Inc. v. United States*,
427 F. Supp. 2d 1278 (Ct. Int'l Trade 2006) ....................................................... 26, 30

*In re Section 301 Cases*,
524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) ........................................................... 13

*La Crosse Tech., Ltd. v. United States*,
723 F.3d 1353 (Fed. Cir. 2013) ................................................................................ 21

*Mattel, Inc. v. United States*,
346 F. Supp. 2d 1295 (Ct. Int'l Trade 2004) ........................................................... 32

*Orlando Food Corp. v. United States*,
140 F.3d 1437 (Fed. Cir. 1998) ................................................................................ 25

*Pomeroy Collection, Ltd. v. United States*,
32 C.I.T. 526 (2008) ................................................................................................. 22

*RKW Klerks Inc. v. United States*,
  592 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ............................................................ 17

*RKW Klerks Inc. v. United States*,
  94 F.4th 1374 (Fed. Cir. 2024) ...................................................................... 16, 17

*Rocknel Fastener, Inc. v. United States*,
  267 F.3d 1354 (Fed. Cir. 2001) ............................................................................ 17

*Rubbermaid Com. Prods., LLC v. United States*,
  32 F. Supp. 3d 1331 (Ct. Int'l Trade 2014) ............................................................ 19

*Second Nature Designs Ltd. v. United States*,
  660 F. Supp. 3d 1352 (Ct. Int'l Trade 2023) .......................................................... 22

*Shamrock Bldg. Materials, Inc. v. United States*,
  119 F.4th 1346 (Fed. Cir. 2024) ............................................................................ 19

*StoreWALL, LLC v. United States*,
  644 F.3d 1358 (Fed. Cir. 2011) ............................................................................ 17

*Swimways Corp. v. United States*,
  329 F. Supp. 3d 1313 (Ct. Int'l Trade 2018) .................................................... 23, 26

*Toy Biz, Inc. v. United States*,
  219 F. Supp. 2d 1289 (Ct. Int'l Trade 2002) .......................................................... 26

**Rules**

USCIT Rule 56(a) ........................................................................................................ 16

**Harmonized Tariff Schedule of the United States**

GRIs:

  GRI 1 ............................................................................................................. *passim*

  GRI 2 ...................................................................................................... 17, 21

  GRI 2(b) ............................................................................................................. 17

  GRI 3 ............................................................................................................. *passim*

  GRI 3(a) ...................................................................................................... 17, 25

  GRI 3(b) ............................................................................................................. *passim*

  GRI 3(c) ............................................................................................ 15, 17, 25, 32

iv

GRI 6.......................................................................................................... 17, 18

Chapter 39:

Heading 3925 ....................................................................................................... 31

Chapter 46:

Heading 4602 ....................................................................................................... 31

Chapter 63:

Note 1 to Chapter 63 ............................................................................................ 23

Heading 6303 ................................................................................................. *passim*

Subheading 6303.92.20............................................................................................ 3

Chapter 70:

Heading 7019 ....................................................................................................... 31

Chapter 84:

Note 1(e) to Section XVI ...................................................................................... 21

Heading 8479 ................................................................................................. *passim*

Subheading 8479.89.95............................................................................................. 3

Chapter 99:

Subheading 9903.88.15........................................................................................... 13

U.S. Note 20(s)(i) to Chapter 99............................................................................ 13

**Patents**

US11233478 ....................................................................................................... 6, 29

US11409248 ....................................................................................................... 6, 29

US3032688 .............................................................................................................. 3

US6497267B1...................................................................................................... 6, 28

US6983783B2........................................................................................................... 6

US7281565B2...................................................................................................... 6, 28

US7537040B2 ............................................................................................................... 6, 28

US7599612B2 ............................................................................................................... 6, 29

**Other Authorities**

Explanatory Note 84.79 ............................................................................................. 19, 20

Explanatory Note to Chapter 63 ...................................................................................... 23

Explanatory Note to GRI 3 .............................................................................................. 26

HQ 089411 (June 20, 1991) ....................................................................................... 21, 25

HQ 089831 (Oct. 4, 1991) .......................................................................................... 21, 25

HQ 950334 (Jan. 24, 1992) ........................................................................................ 21, 25

HQ H007654 (July 8, 2009) ........................................................................................ 21, 25

HQ H042584 (Nov. 23, 2009) ..................................................................................... 21, 25

HQ H273307 (May 5, 2023) ........................................................................................ 21, 25

HQ H312768 (Jan. 11, 2022) ................................................................................... *passim*

HQ H329895 (Mar. 7, 2023) ............................................................................................. 19

NY 803553 (Nov. 16, 1994) .............................................................................................. 31

NY H81099 (May 24, 2001) .............................................................................................. 31

NY N010048 (May 3, 2007) ..................................................................................... *passim*

NY N294342 (Apr. 6, 2018) .............................................................................................. 31

NY N315822 (Nov. 27, 2020) ........................................................................................... 31

Webster's New World College Dictionary 860 (4th ed. 2009) ....................................... 19

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: RICHARD K. EATON, JUDGE**

| | | |
|---|---|---|
| LUTRON ELECTRONICS CO., INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Court No.  22-00264 |
| | ) | |
| v. | ) | **NON-CONFIDENTIAL** |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

This case concerns the tariff classification of plaintiff Lutron Electronics Co., Inc.'s automated shade machines.  The shade machines are designed to precisely control an interior environment for a variety of purposes, including but not limited to light control, energy optimization and increased security.  Each model is designed to carry out these functions intelligently and autonomously, whether an occupant is within the space or not.  Lutron was the first to develop such an autonomous machine and is the recognized leader in the relevant industry.

The merchandise at issue consists of single unitary machines made up of an electronic drive unit (EDU), which is the electromechanical component that controls the operation of the shade machine, a panel, and several other components. The EDU, in turn, is comprised of various electromechanical components, including a mandrel, motor, gear train, and printed circuit board that houses the microcontroller, memory components, communications circuitry, motor drive circuitry, and magnetic sensors that enable the machines to function.  Each Lutron shade machine is made to order through a complex, multi-step manufacturing process.

In its advertising, promotions, and sales materials, Lutron consistently emphasizes its

machines' automation. Automated shading machines like Lutron's are in fact a distinct market segment separate from window shades. Indeed, automated shade machines are a part of the residential, commercial, and hospitality automation market segments along with lighting controls, security systems, and audio-visual systems. At least 75 U.S. patents protect the state-of-the-art technology within the EDUs that enables the machines to communicate within a larger system and ensures panels move autonomously, smoothly, and quietly. Lutron's high-tech, EDU-driven machines provide functionality far in excess of, and cost far more than, ordinary window shades and are nearly entirely sold, installed, commissioned, and serviced through automation experts rather than through big-box retailers or interior decorators.

Until recently, the classification of Lutron's machines was well settled. U.S. Customs and Border Protection long agreed that they were classifiable as "machines and mechanical appliances having individual functions" of heading 8479, Harmonized Tariff Schedule of the United States (HTSUS), pursuant to General Rule of Interpretation (GRI) 1. NY N010048 (May 3, 2007). But after the President imposed duties on Chinese-origin textiles (among other products) under Section 301 of the Trade Act of 1974, Customs reversed course. It decided that, pursuant to GRI 3, Lutron's machines are really just textile "curtains," "drapes," or "interior blinds" classifiable under heading 6303, HTSUS, subject to the textile rules of origin, and because the panel materials are made in China, subject to Section 301 duties. HQ H312768 (Jan. 11, 2022).

Lutron's shade machines are correctly and completely classified under heading 8479 under GRI 1: they are electromechanical machines, comprised of multiple components, each working together to autonomously perform a task. Moreover, Customs *agrees* that Lutron's machines are not entirely classifiable under heading 6303. Because the machines are fully classifiable under heading 8479 and not under heading 6303, this case is resolved under GRI 1. And even if it was

2

not, and resorting to GRI 3 were necessary, the machines' essential character is imparted by their EDUs—the most valuable component, classified under heading 8479, that imparts the autonomous functionality for which consumers purchase the machines. *See Conair Corp. v. United States*, 29 C.I.T. 888 (2005).

The Court should grant Lutron summary judgment and classify Lutron's shade machines under heading 8479.

## QUESTIONS PRESENTED

1.      Whether, pursuant to GRI 1, Lutron's shade machines are correctly classified under heading 8479.

2.      If Lutron's shade machines cannot be classified pursuant to GRI 1, whether, pursuant to GRI 3, Lutron's shade machines are correctly classified under heading 8479.

## COMPETING TARIFF PROVISIONS

Subheading 8479.89.95:

> Machines and mechanical appliances having individual functions, not specified, or included elsewhere in this chapter: …Other machines and mechanical appliances:… Other:… Other.

Subheading 6303.92.20

> Curtains (including drapes) and interior blinds; curtain or bed valances: Other: Of synthetic fibers: Other: Window shades and window blinds.

## BACKGROUND

I.      **Lutron, a Technology Company Originally Focused on Lighting Solutions, Developed the First Autonomous Shade Machine, and Improved it With Over Four Decades of Research and Development**

Lutron has always been a technology company—not a curtain seller.  Its late founder, Joel Spira, invented the first commercially viable electric light dimmer switch. US3032688.  By the 1980s, Lutron was "very well established as the leader in electronic controls for electrical light

3

<u>This Page Contains Confidential Information</u>

sources such as incandescent and fluorescent lamps." Pl.'s Ex. 2, Expert Report of Robert C. Newman, Jr. (Newman Report), at 5. Lutron's industry-leading products at that time included automated electric lighting control systems as well as light-dimming systems. *Id.*

But Joel Spira and his team understood that these technologies were "only part of the equation in controlling the total visual environment" within interior spaces. *Id.* at 5-6. Natural light coming through windows plays a role, too. *Id.* at 6. Moreover, heat flows through window glass, which substantially affects a building's energy consumption and the comfort of interior spaces. *Id.* Manually operated or mere motorized shades, however, cannot offer building-wide control of natural light and energy flow. Nor are they sufficient for coordinating the deployment of shades across an entire façade of a building, which improves the aesthetics of the entire building. *Id.* Only an electro-mechanical machine, capable of systems behaviors, can accomplish these tasks. *Id.*

In about 1986, "Lutron began the decades long journey of developing the automated control system based shading systems that it successfully commercialized." *Id.* at 5. This began with [                    ] which was the first autonomous electric shade machine. *Id.* The original concept "was to build a system-based control for shades that automated all shades in a space to affect the total light entering the space as well as control the flow of heat energy to improve HVAC performance." *Id.* at 5. But there were significant challenges that had to be overcome to complete a commercially viable design. *Id.* at 6.

For example, a shade machine must have "absolute position control" of the panel. Non-automated, motorized shades rely on human interaction—pressing a button to start or stop shade movement at the right moment. *Id.* at 7. But an autonomous shade machine does not rely on human involvement and thus must know precisely where the panel is at all times—the panel's

4

This Page Contains Confidential Information

"absolute position"—as well as how to move the panel to a new position.  *Id.* at 6-7.

Additionally, automated shade machines require smooth "motion dynamics."  *Id.* at 7.  As anyone who has operated an interior blind with a pull cord can attest to, moving a panel suddenly or unevenly can cause bunching and cause poor aesthetics—similarly, a shade machine requires the smooth and even application of mechanical force.  *See id.*  But the amount of force needed and energy consumed by the machine is variable.  *Id.*  [[ █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ ]]

After six years of initial research and development, Lutron patented and launched its first shade machine—the Serena—in the early 1990s.  Pl.'s Ex. 3 (Exhibit 14 to the Newman Report) at 9.  The original Serena was offered for sale beginning in 1992 and was the only machine of its type at the time.  *Id.*  It was electromechanically powered, programmable, and automated using sophisticated software that ensured that the machine "always knew the [panel's] position."  *Id.* at 5.

From early research based on the sales of different versions of automated machines, feedback from Lutron's customers made it clear that what they valued most was the quietness, precision control, and multiple stops of the shade machines.  *See id.*  Lutron thus spent the next few decades investing in significant engineering efforts to make its machines quieter, smarter, and even more precise.  Newman Report at 14.  And these efforts have "been substantially directed at the development of the EDU"— not the panel.  *Id.*  Indeed, Lutron has received at least 75 U.S.

5

patents protecting its many electromechanical and software design innovations, including patents covering systems for "ultraquiet motor drive and ESD [electrostatic discharge] protection," US6497267B1, "motorized shade control," US6983783B2, "controlling roller tube rotational speed," US7281565B2, "uniform movement of multiple roller shades," US7537040B2; and methods for "calibrating motorized roller shades," US7599612B2, "tracking a position of a motorized window treatment," US11409248, and "stall protection for a motorized window treatment," US11233478.  Newman Report at 14.

## II.    The Autonomous Shade Machines at Issue Consist of Various Electromechanical Components, Including EDUs—the Centerpieces of the Machines that Control Their Operation

This case concerns three "families" of Lutron shade machines:  the Serena, Sivoia, and Triathalon.  Pl.'s Ex. 1, Lutron's Interrogatory Responses (Lutron Interrog. Resp.) at 4-5; Newman Report at 15.  "None of the shade machines at issue have any means for manual control."  Newman Report at 15.  Each model of shade machine at issue generally has certain components in common.  These include (1) bracketry; (2) a tube; (3) a panel; (4) a hembar; and (5) the electronic drive unit (EDU), which is the electromechanical component that controls the operation of the shade machine.[1]  "Each component has been selected and/or designed to contribute to the behavior of the system as a whole."  Newman Report at 17.  For technical diagrams depicting the various components of the shade machines, see Pl.'s Ex. 10.

*Bracketry*.  The bracketry is what attaches a shade machine to a wall or other interior

---

[1] "Honeycomb" shade machines "do not contain a tube," and with respect to their EDUs, "do not contain a drive-side bearing," "brake," or "output puck" (they instead contain "two or more spools"), but otherwise function the same as other shade machines.  Lutron Interrog. Resp. at 14. The subject entry also contains a part of a shade machine called "WIN-TUBE-P," which is dedicated for use in a shade machine and comprises a tube and panel that connects to an adjacent shade machine.  *Id.* at 5, 14-15.

This Page Contains Confidential Information

structure. Lutron Interrog. Resp. at 6. Mounting a shade machine completely level and with sufficient attachment to a solid backing material ensures that the shade machine will deploy the panel evenly without "telescoping" and will not fall despite being subject to unexpected forces. The bracketry also provides mechanical grounding for the EDU, so that the EDU can apply its motorized, automated rotational torque to rotate the tube. *Id.*

*Tube.* The aluminum or carbon-fiber tube houses the EDU along with drive-side and idler-side bearings, which permit free rotation, and any torsion springs. *Id.* at 7. "The tube also holds the fabric panel and provides mechanical stiffness to support the fabric panel so that it is flat when deployed and so that it rolls up in a level fashion (evenly and squarely)." *Id.* Tubes are built bespoke: their carefully designed parameters will vary depending on the internal components' size and weight, and the characteristics of the fabric panel that is included in the shade machine. *Id.*

*Panel.* The panel is typically made from polyester, fiberglass, or other fibers, and is typically treated with stiffening agents and sometimes has a laminate backing applied. *Id.* The "panel is a component of the machine." Pl.'s Ex. 4, Deposition of Gregory Connor at 71:4–5. It works with the EDU to be positioned in accordance with the effects desired by the user, including "light blocking, aesthetics, reducing solar heat gain, reducing direct UV radiation, privacy, maximizing views," and "visually dividing one space from another," among other things. Lutron Interrog. Resp. at 7. Customers purchasing a shade machine can select various options for a panel, including different materials, colors, styles, and opacities. *Id.* at 36.

*Hembar.* The aluminum hembar, which is situated at the bottom of the panel, is designed to provide just the amount of resistance needed to optimize the EDU's motion characteristics and efficiency profile. Lutron Interrog. Resp. at 7. [[█████████████████

████████████████████████████████████████████████

7

<u>This Page Contains Confidential Information</u>

███████████████████████ ]]  Additionally, the hembar holds the panel flat and uniform as it is repositioned.  *Id.* at 8.  Maintaining the flatness and uniformity of the panel is not merely aesthetic—it is fundamental to continued proper operation of the shade machine.   If creases or wrinkles are present, they will eventually cause the machine to bind and stall and cease to operate.  This of course is of concern with a shade machine such as Lutron's which operates autonomously, without a human present to observe issues and halt movement of the machine.  *See* Pl.'s Ex. 5, Deposition of John Bull (Bull Dep.) at 44:16–24.

*EDU.*  The EDU controls the shade machines' operation through electromechanical means. Lutron Interrog. Resp. at 7.  Since the inception of the idea of autonomous shading systems in 1986, it has been the "centerpiece" of a Lutron shade machine.  Newman Report at 21.  It is also typically the most expensive component of a shade machine, exceeding the cost of panel in some cases by two to three times.  Pl.'s Ex. 6.   The EDU uses electricity to "send and receive communications messages and accordingly drive the rotation of an electric motor which is connected to the shade tube via a mechanical drive train."  Lutron Interrog. Resp. at 8.  The EDU— the "brawn" and the "brains" of a shade machine—consists of several sub-components that interact with each other and with the machine as a whole.

First, the EDU's "brawn."  The molded-plastic "mandrel" or "drive-side bearing" connects to the bracket and provide rotation of the tube in either direction with low friction.  *Id.*  An electric motor provides "rotational torque" to the gear train.  *Id.* at 8, 11.  The gear train, in turn, converts that rotational torque to the "output puck," which drives the tube to rotate and thus raises or lowers the panel.  *Id.* at 11.  Specifically, the gear train consists of first-stage gears, sometimes a brake, third-stage gears, and the "output shaft and puck"—the latter of which "interfaces the EDU with the shade tube" to rotate the tube and the panel.  *Id.* at 11-12.  In other words, using these

<u>This Page Contains Confidential Information</u>

mechanical components, the EDU "convert[s] electrical energy into mechanical energy that is transferred through each part of the machine including the panel to the hembar" to cause the panel to deploy or retract.  Newman Report at 17.

Next, the EDU's "brains": its printed circuit board assembly (PCB).  The PCB "houses the microcontroller, memory components, communications circuitry, motor drive circuitry, and magnetic sensors that enable the EDU to perform its functions."  Lutron Interrog. Resp. at 9.  The motion-control circuitry of the PCB, **[[** ███████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████ **]]** The microcontroller, which usually is a 32-bit processor that runs custom, upgradeable software, controls all the shade machine's functions.  *Id.*  Those functions include, among other things, communicating and responding to commands; **[[**████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ **]]**

The software on the EDU's microcontroller also enables the EDU to perform functions beyond simply repositioning a shade.  *Id.* at 28.  █████████████████████████

███████████████████████████████████████████████

████████████████████████ ] And through wireless or link-based protocols, the EDU can communicate with other devices (such as keypads, sensors, and even voice assistants like Alexa, Google, and Siri) to accomplish its functions.  *Id.* at 30–31.

Pl.'s Ex. 11 depicts the printed circuit board assembly: **[[**

9

This Page Contains Confidential Information



]]

And Pl.'s Ex. 12 shows the various components that make up a Lutron shade machine: [[



]]

<u>This Page Contains Confidential Information</u>

Because of the shade machines' electronic systems and radio-frequency communications capability, the machines are subject to various regulatory standards, including FCC regulations governing communication devices and Underwriters Laboratories safety requirements. Newman Report at 13-14.

The shade machines are manufactured through a complex "multi-step process." Lutron Interrog. Resp. at 33. **[**█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████**]]**

As noted, the shade machines at issue function "to precisely, autonomously and intelligently control the positioning of a panel via electromechanical means for a wide variety of purposes." *Id.* at 17. For instance, they provide privacy "by blocking views of the interior" from outside a space; "optimiz[e] heat gain or loss"; "increas[e] energy efficiency by maximizing available daylight" within a space; "control[] against glare"; "alter[] the acoustics of an interior environment"; "divid[e] interior spaces into smaller areas"; "protect[] against" UV damage;

**[**█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████**]]**; and "allow[] for collective and

11

autonomous movement of panels in an emergency situation (such as a fire or a [burglary]).” *Id.* at 17-18.

The shade machines are far more expensive than ordinary manually operated or motor operated interior shades or blinds, and are nearly exclusively sold through residential, commercial, and hospitality automation experts and technology integrators like Premier Systems—not interior decorators or shade retailers. Newman Report at 15 (“[T]he Lutron systems carry an associated cost and therefore corresponding consumer price that puts them in an entirely different category from manually operated window shades.  It is unfathomable for a customer to spend the amount [of] money they do for the Lutron shading system if they just wanted a simple manual shade with the same shading panel material.”); Pl.’s Ex. 7, Expert Report of Ken Johnson (Johnson Report) at 4 (“Automated Window Treatments are roughly 3-4 times the price of standard window treatments that are generally provided by interior designers or shade retailers.… Generally, companies that design, install, program, and warrant automated home systems, which include automated window treatments, are NOT interior designers.”).   Integrators provide certain technologies, including audio, video, security, automated shading, network, and surveillance systems, for homes and offices. Johnson Report at 4. They design and install integrated control systems using these technologies. *Id.*  Autonomous functionality is the single most important element driving consumer sales decisions and prices in this market segment. *Id.* at 4-5.

Accordingly, although Lutron highlights its panel options, Lutron’s marketing and advertising of its shade machines primarily focuses on their autonomous, intelligent capabilities, rather than the characteristics of the machines’ panels. *See* Pl.’s Ex. 8.  And consumer surveys confirm that customers value Lutron’s shade machines for their automated functionality and how quiet they are—not for the material out of which the panel is made. *See* Pl.’s Ex. 9 at 42 (customer

12

feedback explaining that "Lutron motorized shades are incredibly prized in residences such as this penthouse …, as they allow the owner to control the light and mood with the touch of a button.… Lutron motorized shades … can even be controlled with a tablet or smartphone …"); Johnson Report at 4–6; Bull Dep. at 102:11–19 ("most of our customers are going to use" shade machines for "autonomous, smart functionality," and that "has really been the determining factor why people choose these products").

III.    **After Section 301 Duties are Imposed on Textiles, Customs Upends its Prior Ruling Classifying Lutron's Shade Machines as Machines and Reclassifies Them as Textiles**

Historically, Customs classified Lutron's shade machines as machines.  In 2007, Lutron obtained a ruling holding that shade machines are properly classified under heading 8479.  NY N010048.  That ruling explained that shade machines, consisting of "fabric shades, hem bars, one (or more) quiet electronic drive units …, roller tubes, … brackets and associated hardware," are "used for commercial and residential applications" to "reduc[e] glare, protecting furnishings from U/V damage and maximizing HVAC efficiency." *Id.*  For 15 years, that classification was settled.

Things changed after the President imposed duties on certain Chinese-origin goods, including textiles, under Section 301 of the Trade Act of 1974.  Specifically, in 2017, "the President issued a memorandum instructing the USTR to consider … initiating an investigation addressing" China's "laws, policies, practices, or actions that may be unreasonable or discriminatory." *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1359 (Ct. Int'l Trade 2021).  The USTR in turn initiated an investigation, which led to the imposition of additional duties on Chinese-origin goods. *Id.*  These duties were later expanded in September 2019 to cover additional products through "List 4," *see id.*, including products classified under subheading 6303.92.20. *See* subheading 9903.88.15; U.S. Note 20(s)(i) to Chapter 99.

Not long after, on September 30, 2020, Customs provided notice that it was reconsidering

13

how it was classifying Lutron's shade machines. Instead of classifying them as machines of heading 8479, free of any Section 301 duties, Customs decided that the shade machines should instead be classified as textile articles of heading 6303, a classification that carries Section 301 duties when the panel is Chinese origin. HQ H312768. Lutron submitted a comment in response to the proposed modification of NY N010048, pointing out both that GRI 1 required classification under heading 8479 and that the essential character of its shade machines is imparted by their EDUs rather than their panels, but Customs disagreed. *See id.* Customs classified the shade machines under heading 6303, which in turn required the machines' country-of-origin to be determined by the textile rules of origin. And under the textile rules of origin, the machines were deemed Chinese and thus subject to Section 301 duties, because they had Chinese-origin panels (though Lutron sources panels from many different countries).

The shade machines at issue in this case were contained in a single entry made on April 7, 2022. ECF No. 1 at 1. The entry liquidated on June 10, 2022, and was timely protested on the grounds of classification on August 12, 2022. *Id.* Customs denied Lutron's protest on September 2, 2022. This action was then timely filed on September 13, 2022, after all liquidated duties, charges and exactions had already been paid.

## SUMMARY OF ARGUMENT

Lutron's shade machines are properly classified, under GRI 1, as "machines and mechanical appliances having individual functions" of heading 8479. "Machines and mechanical appliances" are devices with moving parts to perform some task using electrical or mechanical power—as dictionaries, caselaw, and Customs itself all agree. That definition wholly describes the shade machines. The shade machines are comprised of various electromechanical and moving parts, including the EDU (with its mandrel, motor, gear train, and printed circuit board), panel, and

14

hembar, all of which work in coordination to intelligently and autonomously control an interior space's lighting, privacy, and security by deploying or retracting the panel using mechanical power. That makes the shade machines "machines" or "mechanical appliances" of heading 8479. And that a textile panel specially made to be incorporated into a shade machine, if entered separately, would be classifiable as a textile, does not remove the shade machines from heading 8479. That provision describes the shade machines in whole—including their constituent panels. Nor is there any "textile component" exception to heading 8479.

Customs, for its part, rightly agrees that the shade machines cannot be classified pursuant to GRI 1 under its preferred provision, heading 6303. That heading only covers textiles (with, at most, mere trimmings or accessories), but the shade machines primarily consist of non-textile components. Plus, they have features substantially in excess of an ordinary curtain or interior blind. Because the shade machines cannot be classified under any other heading under GRI 1, heading 8479 prevails. That is enough to decide this case.

But even if it were not, and resorting to GRI 3 were necessary, Lutron's shade machines are still properly classified under heading 8479. For one, the shade machines' EDUs impart their essential character under GRI 3(b). They are the most expensive component, are always in use, provide the machines' functionality, are indispensable to that functionality, and are the reason why consumers buy these intelligent, autonomous shade machines from home-automation experts. The panels, by contrast, are typically less costly, interchangeable, in use only part of the time, not as indispensable as the EDU, and dependent on the EDU.

Further yet, even if the panels were *equally* as essential as the EDUs, Lutron's shade machines are *still* properly classified under heading 8479. Heading 8479 comes after heading 6303. Thus, under GRI 3(c), which states "[w]hen goods cannot be classified under GRI 3(a) or

15

3(b), they shall be classified under the heading that occurs last in numerical order among those which equally merit consideration[,]" Lutron's shade machines are correctly classified under heading 8479. Each of the GRIs thus points to the same result: the shade machines are "machines and mechanical appliances having individual functions" of heading 8479.

**ARGUMENT**

## I.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT Rule 56(a). Because there is no dispute as to any material facts, the Court's determination "of the classification of the goods collapses into a determination of the proper meaning and scope of the HTSUS terms that, as a matter of statutory construction, is a question of law." *RKW Klerks Inc. v. United States*, 94 F.4th 1374, 1378 (Fed. Cir. 2024) (quotation omitted).

"The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." *ADC Telecomms., Inc. v. United States*, 916 F.3d 1013, 1017 (Fed. Cir. 2019) (quotation omitted). The HTSUS also contains "General Rules of Interpretation (GRIs) that govern the classification of merchandise." *RKW Klerks*, 94 F.4th at 1378. "The GRI[s] apply in numerical order, meaning that subsequent rules are inapplicable if a preceding rule provides proper classification." *ADC Telecomms.*, 916 F.3d at 1017 (quotation omitted).

"GRI 1 provides, 'classification shall be determined according to the terms of the headings and any relative section or chapter notes.'" *RKW Klerks*, 94 F.4th at 1378 (quoting GRI 1). Thus, "[w]hen applying GRI 1, [a] court first construes the language of the heading, and any section or

16

chapter notes in question, to determine whether the product at issue is classifiable under the heading." *Id.* (quotation omitted). Where a tariff term is not defined in the HTSUS, "the term's correct meaning is its common meaning," which is "presumed to be the same as its commercial meaning." *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356 (Fed. Cir. 2001) (quotation omitted). "In order to determine the common commercial meaning of a tariff term, courts may consult dictionaries, encyclopedias, scientific authorities, and other reliable information sources." *StoreWALL, LLC v. United States*, 644 F.3d 1358, 1363 (Fed. Cir. 2011). That includes the World Customs Organization's explanatory notes to the Harmonized Tariff Schedule, which, though not binding, "are 'generally indicative' of the proper interpretation of a tariff provision." *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008) (quotation omitted). "The HTSUS is designed so that most classification questions can be answered by GRI 1." *RKW Klerks Inc. v. United States*, 592 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2022) (quotation omitted), *aff'd*, 94 F.4th 1374 (Fed. Cir. 2024).

If classification cannot be resolved under GRI 1, then the Court turns to the subsequent GRIs. GRI 2 provides that "[t]he classification of goods consisting of more than one material or substance shall be according to the principles of rule 3." GRI 2(b).

GRI 3, in turn, provides three successive rules for deciding between two or more potentially applicable tariff headings. *First*, under GRI 3(a), the heading that "provides the most specific description shall be preferred to headings providing a more general description"—but if the competing headings "each refer to part only of the materials or substances contained in mixed or composite goods," then they "are to be regarded as equally specific." *Second*, under GRI 3(b), "composite goods … made up of different components" that cannot be classified under GRI 3(a) "shall be classified as if they consisted of the … component which gives them their *essential*

17

*character*."  And *third*, under GRI 3(c), "[w]hen goods cannot be classified" under GRI 3(a) or 3(b), the heading "last in numerical order" wins.

After determining the heading under which a good is classified, the Court must then determine the applicable subheading pursuant to GRI 6. "[T]he classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the [preceding GRIs] on the understanding that only subheadings at the same level are comparable." GRI 6.

## II.    Pursuant to GRI 1, Lutron's Shade Machines are Classifiable as "Machines" or "Mechanical Appliances Having Individual Functions" of Heading 8479

This classification case starts—and indeed ends—with GRI 1.  Lutron's shade machines meet all textual conditions for classification under heading 8479: they are (1) "machines" or "mechanical appliances having individual functions" and are (2) "not elsewhere specified or included in" chapter 84 of the HTSUS.  Heading 8479.  Nor can the shade machines be fully classified under GRI 1 as purely textile "curtains," "drapes," or "interior blinds" of heading 6303. They are not simply bolts of fabric with trimmings or accessories—they contain components and features far in excess of that.  And Customs *agrees*: "the subject merchandise is not classified by application of GRI 1 in heading 6303, HTSUS."  HQ H312768.   Accordingly, because heading 8479 describes the shade machines, and because no other heading applies, the shade machines must be classified under heading 8479.

### A.  Lutron's Shade Machines are "Machines" or "Mechanical Appliances"—They are Electromechanical Devices that, Through Their EDUs, Intelligently and Autonomously Retract and Deploy a Panel to Control an Interior Environment

Heading 8479 covers "machines and mechanical appliances having individual functions." The term "machine" "generally connote[s] equipment designed specifically to carry out a particular function."  *Gerson Co. v. United States*, 898 F.3d 1232, 1236 (Fed. Cir. 2018) (citing

18

Webster's New World College Dictionary 860 (4th ed. 2009) (defining "machine" as "a structure consisting of a framework and various fixed and moving parts, for doing some kind of work" or "any device thought of as functioning in such as way")). And "mechanical appliances," as this Court has explained, "incorporate moving parts to perform work." *Rubbermaid Com. Prods., LLC v. United States*, 32 F. Supp. 3d 1331, 1343 (Ct. Int'l Trade 2014).

Customs, for its part, offers similar definitions. A "machine" is an "object with moving parts that performs work by applying" or "using" "mechanical or electrical power." Pl.'s Ex. 13, Defendant's Interrogatory Responses (Gov't Interrog. Resp.) at 8-9. And a "mechanical appliance" is "a piece of machinery or equipment adapted to a special purpose, which is operated by a system of moving parts that apply" or "use" "mechanical or electrical power to perform work." *Id.*; *accord* HQ H329895 (Mar. 7, 2023) (explaining that a machine is "a piece of equipment with moving parts that does work when it is given power"); Pl.'s Ex. 14, Deposition of Patricia O'Donnell (O'Donnell Dep.) at 38:2-4, 40:16-24, 42:19-43:6. In sum, a "machine" or "mechanical appliance having individual functions" is a device that performs a particular task using electrical or mechanical power.

Explanatory Note 84.79 reinforces this broad understanding of heading 8479. *See, e.g.*, *Shamrock Bldg. Materials, Inc. v. United States*, 119 F.4th 1346, 1354 (Fed. Cir. 2024) (the Explanatory Notes can "confirm[]" the court's interpretation of a heading's text). The machines and mechanical appliances covered by heading 8479 are "many and varied." Explanatory Note 84.79. They include "[m]echanical devices, with or without motors or other driving force, whose function can be performed distinctly from and independently of any other machine or appliance." *Id.* And the heading, as the Explanatory Note confirms, encompasses all sorts of machines and appliances—not just those used in industry. For example, devices used to control interior

environments—air humidifiers, dehumidifiers, and evaporative air coolers—are offered as examples of products classifiable under heading 8479. *Id.*

Lutron's shade machines thus fit comfortably within heading 8479. The shade machines are comprised of a bevy of electromechanical components—motors, printed circuit boards, gears, and mandrels, to name a few—and both moving and stationary parts are necessary for the shade machines' function including the tubes, bracketry, panels, and hembars. Each of these parts performs a defined function that contributes to the overall autonomous function of the shade machines. The printed circuit board assembly, for example, is the "brains" of the shade machine and instructs the moving parts to cause the panel to deploy and retract. The motor provides rotational torque to the gears, and the gears in turn convert torque to the output puck, which drives rotation of the tube. The tube houses the EDU and supports the panel. And the hembar provides weight and resistance to the panel to optimize the motion characteristics and efficiency profile of the shade machine, while also holding the panel flat and uniform.

These components work together using electromechanical force, all the way from the mounting hardware down through the panel and to the hembar, to perform an individual function: intelligent and automated control of an interior space. *See, e.g.*, Pl.'s Ex. 12. As Lutron's expert explains, the shade machines "convert electrical energy into mechanical energy that is transferred through each part of the machine including the panel to the hembar. In addition, each component of the machine is designed such that the force applied back through the system by the panel and the hembar is perfectly balanced for proper operation both in motion [and] at rest." Newman Report at 17-18. In other words, electromechanical force runs through the entire shade machine to deploy and retract the panel, all without any human input.

Customs apparently believes that Lutron's shade machines do not meet the terms of

20

heading 8479 because they include textile panels, *see* HQ H312768, but that is wrong several times over. First, there is no such limitation present in heading 8479's text. Nothing in heading 8479 or any of the applicable chapter or section notes provides that a "machine" or "mechanical appliance" cannot contain a part made of textile. Plenty of machines and mechanical appliances of heading 8479 have textile parts: knick-knacks like "musical flags" are machines with textiles, HQ 089831 (Oct. 4, 1991); lawn tractors have textile "lawn sweeper bags," HQ H042584 (Nov. 23, 2009); and textile straps form part of winches, ratchets, and similar machines, HQ H273307 (May 5, 2023); HQ H007654 (July 8, 2009); HQ 950334 (Jan. 24, 1992); HQ 089411 (June 20, 1991). In fact, the only textile-related exclusion that could apply to heading 8479 is for merchandise that amounts to "conveyor belts" or similar articles classifiable in headings 5910 or 5911. *See* Note 1(e) to Section XVI. That sole exception plainly does not cover Lutron's shade machines. The shade machines are not conveyor belts, and neither are their panels. And Customs must agree, given that it classified the shade machines under heading 6303 rather headings 5910 or 5911.

Second, Customs' theory that the presence of the panel somehow removes the shade machines from heading 8479 rests on a fundamental misunderstanding of the GRIs. Customs theorized that because the panels "are specifically provided for in heading 6303," the "entire controllable shading system is not specifically provided for in any one heading." HQ H312768. But that gets the GRIs backwards. The panels were not entered separately; they were entered with, and form an integral part of, the shade machines. The first question in any classification analysis is whether the subject merchandise, assessed as a whole, in its imported condition, can be classified pursuant to GRI 1. *See, e.g.*, *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353, 1358 (Fed. Cir. 2013) (explaining that merchandise is classifiable under GRI 1 if it "is described in whole by a single classification heading"). If it cannot, only *then* does consideration of whether a

21

merchandise is a "composite good" under GRI 2 follow.

Yet, if tariff classification required "looking through" an imported machine's components and assessing which headings would apply to each of them, as Customs suggests, then just about every imported machine would have to be classified under GRI 2 and 3. For example, a fully assembled car would not be covered by any one heading, because its tires, engine, battery, glass, and seats—had they been entered separately—would all be specifically provided for in headings other than a heading covering a fully assembled car. This analysis is inconsistent with the GRIs, as this Court repeatedly has explained. "[T]he mere fact that a piece of merchandise consists of more than one item or article does not necessarily make that merchandise … a 'composite good' subject to classification under GRI 3(b). GRI 3(b) applies only if no provision exists in the Harmonized System that provides for the … composite good *as a whole*." *Pomeroy Collection, Ltd. v. United States*, 32 C.I.T. 526, 543–44 (2008) (quotation and alterations omitted); *Second Nature Designs Ltd. v. United States*, 660 F. Supp. 3d 1352, 1378 (Ct. Int'l Trade 2023) ("The problem with this argument is that it relies on GRI 3(b) analysis of composite goods when analysis under GRI 1 is not exhausted.").

That Lutron's shade machines include panels confirms, rather than undermines, that the machines fit within heading 8479's plain language—the panels, like every other component, form part of and contribute to the function of the machines as a whole.

**B. Lutron's Shade Machines are "Not Elsewhere Specified or Included" in Chapter 84**

Lutron's shade machines meet the remaining requirement of heading 8479 because they are "not elsewhere specified or included" in chapter 84 of the HTSUS. Customs has not identified any heading within chapter 84 that might describe Lutron's shade machines. Indeed, neither NY N010048 nor HQ H312768 identified any other candidate heading. As such, Lutron's shade

22

machines are classifiable solely under heading 8479.

### C. Lutron's Shade Machines Cannot be Classified as "Curtains," "Drapes," or "Interior Blinds" of Heading 6303 Because They are not Merely Textile Articles—as Customs Rightly Concedes

Customs does not contend that Lutron's shade machines are classifiable under heading 6303 pursuant to GRI 1—and rightly so. Heading 6303 covers "curtains," "drapes," and "interior blinds." Note 1 to chapter 63, however, clarifies that "[s]ubchapter 1," which includes heading 6303, "applies only to made up articles, of any textile fabric."

That renders heading 6303 inapplicable. As this Court has explained before, an article cannot be described as "of textile fabric" if it contains "significant components that are not made of a textile material." *Swimways Corp. v. United States*, 329 F. Supp. 3d 1313, 1320–21 (Ct. Int'l Trade 2018). And that is the case here: the most important and expensive component of the shade machines is the EDU, which is not made of textile. "The presence of these significant components means that the term 'made up articles, of any textile fabric' … does not correctly describe the entire assembly." *Id.* Moreover, the Explanatory Note to Chapter 63 confirms that articles classifiable under heading 6303 cannot contain "other materials [that] constitute[] more than mere trimming or accessories." *Id.* at 1321 n.11 (quoting the Explanatory Note). The shade machines, even more so than the product at issue in *Swimways*, "have significant non-textile components that are not merely trimming or accessories." *Id.* at 1321.[2] As such, Lutron's shade machines are not mere textiles of heading 6303.

---

[2] The pool floats at issue in *Swimways* had some components "made of polyester fabric," but also had a "PVC plastic" "bladder," a steel "spring," and a "polypropylene" tube. 329 F. Supp. 3d at 1320–21. These relatively minor plastic and steel components were nevertheless "significant" enough to lead the Court to conclude that the pool floats were not merely textiles classifiable under heading 6307, which like heading 6303 is also within subchapter 1 of chapter 63. *Id.*

23

This Page Contains Confidential Information

Even if heading 6303 were somehow not limited to mere textiles, it would still not apply here because the term "interior blinds" does not accurately describe Lutron's shade machines. The machines "possess features substantially in excess of those within the common meaning of the term[s]" "interior blinds" or "window shades." *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1368 (Fed. Cir. 2011). At a minimum, the EDU (including its printed circuit board assembly, motor, and gear train, among other components) provides functionality far in excess of a simple interior blind or window dressing. For example, unlike static window treatments, Lutron's shade machines store data, communicate with other devices, and work when nobody is around not only to protect interior spaces from light and UV light [█████████████████████████ ██████████████████] That is a far cry from a manually operated, or even a motorized, window treatment. *See CamelBak Prods.*, 649 F.3d at 1368 (backpack that held liquid in a bladder was not simply a backpack).

And as noted, Customs agrees that heading 6303 cannot apply at GRI 1. In its ruling, it explained that "the subject merchandise is not classified by application of GRI 1 in heading 6303, HTSUS." HQ H312768. In its responses to contention interrogatories, Customs maintained that position. *See* Gov't Interrog. Resp. at 11. And throughout this litigation, Customs has repeated that it believes classification under its preferred heading is not possible under GRI 1. *See, e.g.*, ECF No. 51 at 5 ("[T]he Government contends that GRI 3(b)'s 'essential character' test should be applied because the merchandise is a composite good.").

As such, GRI 1 resolves this case: because Lutron's shade machines are classifiable under heading 8479, and because Customs agrees that the machines cannot be classified under heading 6303, the machines must be classified under heading 8479.

**III.    Even if Resorting to GRI 3 Were Necessary, Lutron's Shade Machines Would Still be Properly Classified under Heading 8479**

Even if Lutron's shade machines were somehow not classifiable as machines or mechanical appliances of heading 8479 under GRI 1 (they are), they would *still* be rightly classified under heading 8479 pursuant to GRI 3.  First, under GRI 3(b),[3] the machines' EDUs impart the essential character: the EDUs provide the machines' primary functionality, which is what drives consumer purchasing decisions; they are indispensable to the machines' operation; they are typically the most expensive component, both in terms of material cost and in terms of investment, research, and development; and they are, unlike the panel, in use all of the time.  And second, even if the panel were somehow equally essential as the EDU, it would make no difference.  GRI 3(c) would *still* dictate classification under heading 8479, because it appears later in the HTSUS than heading 6303.  Thus, even if GRI 3 were applicable, it would not change the result—Lutron's shade machines are correctly classified under heading 8479.

**A.    Under GRI 3(b), the EDUs Impart the Essential Character of the Shade Machines— not the Panels**

Customs contends that a GRI 3(b) "essential character" analysis is necessary to determine the correct classification of Lutron's shade machines.  Under GRI 3(b), goods are classified as if they consisted solely of the "component which gives them their essential character."  Lutron's

---

[3] Under GRI 3(a), unless each heading only describes part of the merchandise, the heading "with requirements that are more difficult to satisfy and the describe the article with the greatest degree of accuracy and certainty" prevails. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998).  Heading 8479 describes the entirety of Lutron's shade machines for the reasons discussed above—a "machine" is still a machine, even if it contains a textile component. *See* HQ H042584 (Nov. 23, 2009); HQ H273307 (May 5, 2023); HQ H007654 (July 8, 2009); HQ 950334 (Jan. 24, 1992); HQ 089411 (June 20, 1991); HQ 089831 (Oct. 4, 1991).   And it is undoubtedly more difficult for an article to be a "machine" or "mechanical appliance," or a complex device containing mechanical parts that perform a function, than a mere "curtain."

shade machines are accordingly classified under heading 8479, because that is where their EDUs—their essential component—is classified.

The essential component of an article is "the component which is indispensable to the structure, core, or condition of the article, i.e., the attribute which strongly marks or serves to distinguish what it is." *Home Depot USA, Inc. v. United States*, 427 F. Supp. 2d 1278, 1293 (Ct. Int'l Trade 2006), *aff'd*, 491 F.3d 1334 (Fed. Cir. 2007). "The factor which determines essential character will vary as between different kinds of goods." Explanatory Note to GRI 3, at (VIII). "The list of possible factors set forth in the [Explanatory Notes] that could determine essential character is not exhaustive, and no factor is necessarily conclusive." *Home Depot U.S.A., Inc. v. United States*, 435 F. Supp. 3d 1311, 1323 (Ct. Int'l Trade 2020).

The Explanatory Notes provide several factors to consider: "the nature of the material or component, its bulk, quantity, weight or value, or by the role of a constituent material in relation to the use of the goods." *See, e.g., Home Depot U.S.A. Inc. v. United States,* 491 F.3d 1334, 1336 (Fed. Cir. 2007); *Swimways*, 329 F. Supp. 3d at 1322. This Court has also considered factors such as "primary function," "ordinary common sense," *Home Depot*, 427 F. Supp. 2d at 1293, "the respective indispensability of the properties of the components of the merchandise, the respective cost of the components of the merchandise, the basis for a consumer's decision to purchase the merchandise," and "the respective duration and/or frequency of the use of the components," *Toy Biz, Inc. v. United States*, 219 F. Supp. 2d 1289, 1301 n.15 (Ct. Int'l Trade 2002). And, importantly, "one component can impart the article's essential character even if two components are both indispensable to the use of the article." *Home Depot*, 435 F. Supp. 3d at 1323 (citing *Alcan Food Packaging (Shelbyville) v. United States*, 771 F.3d 1364, 1367 (Fed. Cir. 2014)).

26

Applying these factors, the EDUs provide the essential character of Lutron's shade machines. Start with the shade machines' primary function or use. The machines are primarily used to automatically control an interior environment's lighting, heat, aesthetics, security, and privacy. That autonomous functionality is accomplished through the EDU. It is the EDU that monitors conditions, stores and sends out data, decides when to instruct the electromechanical parts to apply force, and directs the panel to retract or deploy to achieve the desired effect in an interior space—all without any human input. And as this Court has explained before, the mechanical components that create a product's desired effects impart the product's essential character. *Conair*, 29 C.I.T. at 896 ("[A]ny appeal to the auditory senses is present only when the pump is transporting water to the top of the Serenity Pond, thus allowing it to flow over the simulated rocks.").

Next, consider indispensability. The EDU is indispensable to the function of Lutron's shade machines. Without them, panels could not retract or deploy at all, let alone do so autonomously. The panels in Lutron's shade machines are manually inoperable and are not designed or intended to deploy or retract without the EDU. The bare panel is, in short, useless without an EDU in a Lutron shade machine. *See Conair*, 29 C.I.T. at 897 ("While the plastic component contributes to the manner in which the water flows, and thus to the Serenity Ponds' auditory and visual appeal, without the pump the water doesn't flow at all.").

The converse, however, is not true. The panel, unlike the EDU is not always in use. Moreover, there are a variety of panels customers can choose from to accompany an EDU, in various materials, colors, styles, and opacities. Interchangeability hardly implies essentiality, especially given that the EDU remains substantially the same. And while it is true that the panels are also indispensable to the function of the shade machines—the panel is ultimately what blocks

27

This Page Contains Confidential Information

light from entering an interior space—that does not preclude the EDU from being *more* indispensable and therefore essential. *Home Depot*, 435 F. Supp. 3d at 1323 ("[O]ne component can impart the article's essential character even if two components are both indispensable to the use of the article."). Plenty of indispensable components of machines do not provide essential character. Power supplies for electronic products, wheels for cars, and propellers for planes are all indispensable, but do not impart the essential character. The same is true here—the EDU is the indispensable brains and brawn of the shade machine, not the panel.

Along similar lines, the EDU is essential because it is in use longer and more frequently than the panel. The panel is only in use when it is deployed. And as Customs' own expert acknowledges, keeping the panel out of use (open position) is as important as keeping it in use. *See* Pl.'s Ex. 15, Deposition of Dr. Ravi Srinivasan (Srinivasan Dep.) at 86:3–9 (agreeing that "allowing light to enter a room" and allowing people inside "to view nature outside" are "important function[s]" of a window). But the EDU, in contrast, is always in use. And many of its activities have little or nothing to do with movement of the panel. For example, it consistently listens for and receives input, **[[ ████████████████████████████ ████████████████████████████ ]]** understands who it is, and sends information out, deciding whether and when to deploy or retract the panel. Thus, the EDU is always working whether or not the panel is moving.

The relative costs of the EDU and the panel also demonstrate that the EDU is the essential component. The EDUs alone typically cost more than the panels—in some cases, nearly two to three times more. And that is just the cost of production. That does not factor in the costs of investment, research, and development associated with the EDUs. Throughout the course of development of its shade machines, Lutron received at least 75 U.S. patents protecting its

28

electromechanical and software design innovations.  These include patents disclosing systems for "controlling roller tube rotational speed," US7281565B2, "ultraquiet motor drive and ESD protection," US6497267B1, and "uniform movement of multiple roller shades," US7537040B2, as well as methods for "calibrating motorized roller shades, US7599612B2, "tracking a position of a motorized window treatment," US11409248, and "stall protection for a motorized window treatment," US11233478.

And if all that were not enough, the basis for a consumer's decision to purchase the merchandise irrefutably demonstrates that the EDU is the essential component of a Lutron shade machine.  "It is completely unfathomable for a customer to spend the amount money they do for the Lutron shading system if they just wanted a simple manual shade with the same shading panel material."  Newman Report at 15.  The machines are thus nearly exclusively sold through residential, commercial, and hospitality automation experts like Premier Systems—not interior decorators or shade retailers.  Integrators provide certain technologies, including audio, video, security, automated shading, network, and surveillance systems, for homes and offices.  Johnson Report at 4.  They design and install integrated control systems using these technologies.  *Id.*  And as an expert home automator explained, autonomous functionality is the single most important element driving consumer sales decisions and prices in this market segment.  *Id.* at 4-5.  That is corroborated by consumer surveys that demonstrate customers purchase Lutron's shade machines for their automated functionality and remarkably quiet operation, rather than the panel's qualities. *See* Pl.'s Ex. 9 at 42.  As such, electromechanical components including the shade machines' EDUs are the critical components driving consumer sales of Lutron's shade machines—not their panels. Johnson Report at 4-5.

Even Customs agrees. As the veteran NIS who authored ruling NY N010048 explained at length, "if you just wanted to close the drapes, why purchase all this other equipment? You want extra sophisticated equipment so you can close the drapes at programmed times. You might not be there, but you want the drapes closed. … I said to myself, 'A shade has got to be cheaper than all this mechanical equipment.' When you look at the engineering drawings and you see all the mechanics. To me, the fabric … would be much cheaper." O'Donnell Dep. at 83:20–85:23. The NIS's "ordinary common sense" is yet more proof that the EDU is a shade machine's essential component. *Home Depot*, 427 F. Supp. 2d at 1293.

Customs' newfound position—that the panel somehow imparts the shade machines' essential character—fails to consider the entirety of the shade machines and is unworkable. Start with Customs' narrow view of the machines. Its "expert" was asked only "to opine on the function of the shade component of the … product." Srinivasan Dep. at 6:5–9. Customs did not ask him to "look at any other component" other than "purely the fabric material, panel material." *Id.* at 71:15–17. And he was not asked to opine on anything else, *id.* at 6:15–17—for instance, the panel's role in relation to the EDU, how important the EDU might be, or even what the function of the EDU was at all. Customs likewise buried its head in the sand at deposition: CBP did not consider many things about the EDU in reaching its position on GRI 3(b), including "the patents on the electro-mechanical components," Pl.'s Ex. 16, Deposition of Parisa Ghazi at 76:7–10, the fact that there is "software necessary to operate the" shade machines, *id.* at 70:14–17, the machines' "ability" to "communicate," *id.* at 70:23–71:8, the machines' "memory storing capabilities," *id.* at 72:2–21, and the channels of trade through which the shade machines move, *id.* at 72:22–74:12. In short, Customs saw the panel and ignored the rest. That does not suffice

for the "fact-intensive" inquiry that GRI 3(b) demands. *Home Depot*, 491 F.3d at 1337 ("[T]he application of this [essential character] test requires a fact-intensive analysis.").

Customs' position is unworkable, too. If Customs were right, the classification of a shade machine would depend entirely on the material from which the panel is made. Thus, a Lutron shade machine entered with a paper or bamboo panel would make the entire machine classifiable as "Basketwork, wickerwork and other articles, made directly to shape from plaiting materials or made up from articles of heading 4601; articles of loofah," of heading 4602. *See* NY N294342 (Apr. 6, 2018) (paper); NY N315822 (Nov. 27, 2020) (bamboo). A shade machine entered with a fiberglass panel would render the entire machine classifiable as "Glass fibers (including glass wool) and articles thereof (for example, yarn, rovings, woven fabrics)," of heading 7019. *See* NY 803553 (Nov. 16, 1994). And a shade machine entered with a plastic panel would be classified as "Builders' ware of plastics, not elsewhere specified or included," of heading 3925. *See* NY H81099 (May 24, 2001). But the simpler analysis—that the EDU imparts the essential character and dictates classification under heading 8479 regardless of the panel's material—is the better, and correct, one.

Furthermore, Customs' position would result in strange country-of-origin determinations. If Customs were right about a fabric panel imparting the essential character, the country-of-origin rules applicable to textiles would apply. But those rules would require an entire shade machine to be classified in accordance with the *panel*'s origin, rather than the *EDU*'s origin—despite the complex, multi-stage process employed in producing an EDU, including the multi-step surface mount technology used to create the EDU's printed circuit board assembly and complex assembly of motors, gear trains, and other components. That is inconsistent with Customs' longstanding position that the country of origin of an electronic appliance is where the printed circuit board is

31

assembled, because that component imparts the finished appliance's "essence." *See, e.g., Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1353–54 (Ct. Int'l Trade 2022).

For all these reasons, the EDUs impart the essential character of Lutron's shade machines. And because it is undisputed that the EDU is classifiable under heading 8479, the machines are accordingly classified under heading 8479 pursuant to GRI 3(b).

**B. Even if the EDUs and Panels Were Equally Essential, GRI 3(c) Would Require Classification Under Heading 8479**

At the very least, the EDU is equally as essential as the panel is to a Lutron shade machine, for the same reasons explained above. But for Customs to prevail, the panel must be *more* essential than the EDU. That is because if both the panel and the EDU are equally essential, then GRI 3(c) applies. And GRI 3(c) provides that when classification cannot be determined under GRI 3(b), the heading last in numeral order prevails. "Whatever else may remain unsettled in the field of customs law, this much is clear: Heading [6303] precedes heading [8479]." *Mattel, Inc. v. United States*, 346 F. Supp. 2d 1295, 1310 (Ct. Int'l Trade 2004). "In sum, all roads lead to the classification of" Lutron's shade machines as "machines" of heading 8479, because heading 6303 is "trumped" by heading 8479 at GRI 1, GRI 3(b), and GRI 3(c). *Id.* at 1310–11.

Accordingly, whether GRI 1, GRI 3(b), or GRI 3(c) applies, Lutron's shade machines must be classified as machines of heading 8479—just as Customs, until 2022, had always classified them.

## **CONCLUSION**

For all these reasons, Lutron's shade machines are properly classified under heading 8479.

The Court should grant Lutron summary judgment and enter judgment in Lutron's favor.

Respectfully submitted,

/s/ Luke Mathers
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-0160
lmathers@strtrade.com
Dated: April 30, 2026                    *Attorneys for Plaintiff*

33

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing submission complies with the word-limitation set forth in

Standard Chambers Procedure 2(B)(1), and contains 9,743 words.


Dated: April 30, 2026

/s/ Luke Mathers
Luke Mathers