**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD K. EATON, JUDGE**

| | | |
|---|---|---|
| LUTRON ELECTRONICS CO., INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Court No. 22-00264 |
| | ) | |
| v. | ) | **PUBLIC VERSION** |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

ARGUMENT ..... 4

I. All of Lutron's Shade Machines are Rightly Classified Under Heading 8479 Pursuant to GRI 1, Regardless of Panel Composition ..... 4

A. The Government's Concessions Prove that Lutron's Shade Machines are Classifiable, in Their Entirety, as "Machines" or "Mechanical Appliances Having Individual Functions" of Heading 8479 Under GRI 1 ..... 6

B. The Government Ignores Precedent Holding that Goods Made up of Multiple Materials or Parts are Still Classifiable Under GRI 1 and Espouses a Theory of Classification that Would Turn the Tariff Schedule on its Head ..... 10

II. Even if GRI 3 Applied, Lutron's Shade Machines' EDUs Impart the Machines' Essential Character, Again Dictating Classification Under Heading 8479 ..... 14

A. The Government Fails to Grapple With the Undisputed Evidence that the EDU, Unlike the Panel, is the Most Expensive Component, Drives Consumer Purchasing Decisions, and is Always in Operation ..... 15

B. The EDU is Indispensable to the Operation of the Shade Machine—as the Government Concedes ..... 17

C. This Court has Already Rejected the Government's "Visibility" Test for Essential Character ..... 19

D. At Most, The Panel is Equally as Essential as the EDU, Requiring Classification Under Heading 8479 Pursuant to GRI 3(c) ..... 21

CONCLUSION ..... 22

# TABLE OF AUTHORITIES

**Cases**

*Applikon Biotechnology, Inc. v. United States*,
807 F. Supp. 2d 1323 (Ct. Int'l Trade 2011) ........ 8

*BenQ Am. Corp. v. United States*,
646 F.3d 1371 (Fed. Cir. 2011) ........ 13

*Conair Corp. v. United States*,
29 C.I.T. 888 (2005) ........ 3, 17, 18, 19

*EOS of N. Am., Inc. v. United States*,
911 F. Supp. 2d 1311 (Ct. Int'l Trade 2013) ........ 8

*Fuji Am. Corp. v. United States*,
519 F.3d 1355 (Fed. Cir. 2008) ........ 8

*G.G. Marck & Assocs., Inc. v. United States*,
2015 WL 3757040 (Ct. Int'l Trade June 17, 2015) ........ 18

*H. Reisman Corp. v. United States*,
17 C.I.T. 1260 (1993) ........ 13

*Home Depot U.S.A., Inc. v. United States*,
427 F. Supp. 2d 1278 (Ct. Int'l Trade 2006) ........ 14, 15

*Home Depot U.S.A., Inc. v. United States*,
435 F. Supp. 3d 1311 (Ct. Int'l Trade 2020) ........ 18

*Home Depot U.S.A., Inc. v. United States*,
491 F.3d 1334 (Fed. Cir. 2007) ........ 18

*Home Depot U.S.A., Inc. v. United States*,
915 F.3d 1374 (Fed. Cir. 2019) ........ 11

*ME Global, Inc. v. United States*,
633 F. Supp. 3d 1349 (Ct. Int'l Trade 2023) ........ 12, 14

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) ........ 5

*Pomeroy Collection, Ltd. v. United States*,
559 F. Supp. 2d 1374 (Ct. Int'l Trade 2008) ........ 2, 10, 11, 12

*Rainin Instrument Co. v. United States*,
288 F. Supp. 2d 1360 (Ct. Int'l Trade 2003) ........ 8

*Rico Import Co. v. United States*,
12 F.3d 1088 (Fed. Cir. 1993) ........ 9, 20

*Second Nature Designs Ltd. v. United States*,
660 F. Supp. 3d 1352 (Ct. Int'l Trade 2023) ........ 2, 10, 11

*Swimways Corp. v. United States*,
329 F. Supp. 3d 1313 (Ct. Int'l Trade 2018) ........ 2, 12

*Toy Biz, Inc. v. United States*,
219 F. Supp. 2d 1289 (Ct. Int'l Trade 2002) ........ 14, 15, 17

*Wilton Indus., Inc. v. United States*,
741 F.3d 1263 (Fed. Cir. 2013) ........ 2, 11

*Worthington v. Robbins*,
139 U.S. 337 (1891) ........ 9

**Harmonized Tariff Schedule of the United States**

General Rule of Interpretation 1 ........ *passim*

General Rule of Interpretation 3 ........ 11, 12, 13

General Rule of Interpretation 3(b) ........ *passim*

General Rule of Interpretation 3(c) ........ 3, 15, 21

Chapter 39 ........ 12

Note 2(s) to Chapter 39 ........ 3, 13

Note 11(f) to Chapter 39 ........ 13

Heading 3925 ........ 6, 11, 12

Subheading 8479.89.95 ........ 14, 21, 22

Chapter 63 ........ 12

Note 1 to Chapter 63 ........ 12

Heading 6303 ........ 2, 11, 12

Chapter 84

Heading 8479 ........ *passim*

Note 2 to Section XVI ........ 9

Note 3 to Section XVI ..... 13

Note 4 to Section XVI ..... 13

**Other Authorities**

Explanatory Note 84.79 ..... 9, 10

Explanatory Note to Chapter 63 ..... 12

Explanatory Note to GRI 3(b) ..... 15

HQ H312768 ..... 6

NY N010048 ..... 1

NY N013565 ..... 7

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD K. EATON, JUDGE**

| | | |
|---|---|---|
| LUTRON ELECTRONICS CO., INC., Plaintiff, v. UNITED STATES, Defendant. | ) | Court No. 22-00264 **PUBLIC VERSION** |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

All of Lutron's shade machines, regardless of panel composition, are machines of heading 8479—a position that U.S. Customs and Border Protection itself held for nearly 15 years. NY N010048 (May 3, 2007). In an attempt to avoid this conclusion, the government has argued for a novel theory that would require essentially rewriting the tariff schedule and ignoring precedent.

The government concedes that "[m]achines and mechanical appliances" of heading 8479 are "apparatus using or applying mechanical power and having several parts, each with a definite function and together performing a particular task." ECF No. 80 (Def. Br.) at 22 (quotation omitted). The government does not contest that "[e]ach component" of Lutron's shade machines "has been selected and/or designed to contribute to the behavior of the system as a whole." ECF No. 80-1 (Def.'s Resp. to Pl.'s SOF) ¶ 14. The government concedes that Lutron's shade machines' major part—the electronic drive unit (EDU)—"is classifiable in heading 8479." Def. Br. at 9. The government concedes that the shade machine's "panel is a component of the machine." Def.'s Resp. to Pl.'s SOF ¶ 17; *see* ECF No. 80-2 (Def.'s SOF) ¶ 23 (the shade

machines "are imported as a single assembled unit" comprising a panel and an EDU, among other components). And the government concedes that the "presence of [a] textile" part, such as the shade machine's panel, "does not, by itself, disqualify" an article "from classification in heading 8479." Def. Br. at 24. That is all that the Court needs to resolve this case in Lutron's favor: the shade machines, panels and all, are "[m]achines [or] mechanical appliances having individual functions" of heading 8479 pursuant to General Rule of Interpretation (GRI) 1.

To justify classifying Lutron's shade machines as mere textiles or plastic builders' ware, the government argues that this Court should essentially ignore GRI 1 and consider Lutron's shade machine a "composite good" by skipping ahead to GRI 3(b)'s essential-character test. The Federal Circuit has repeatedly held that GRI 1 must be exhausted before proceeding to subsequent GRIs. *See, e.g.*, *Wilton Indus., Inc. v. United States*, 741 F.3d 1263, 1266 (Fed. Cir. 2013). And as this Court has repeatedly held, there is no "composite good" exception to GRI 1—a good made up of different parts, like all other goods, must be classified first pursuant to GRI 1. *Second Nature Designs Ltd. v. United States*, 660 F. Supp. 3d 1352, 1378-79 (Ct. Int'l Trade 2023); *Pomeroy Collection, Ltd. v. United States*, 559 F. Supp. 2d 1374, 1391-92 (Ct. Int'l Trade 2008). Rather than contend with these cases, the government ignores them.

Moreover, applying the government's theory of tariff classification leads to chaos. Any imported good with more than one material or part (that is, most goods, and all machines) would need to be classified under GRI 3(b)'s essential-character test from the outset. This means that a machine with a textile component could be classified as a textile of heading 6303—even though that provision only covers textile fabric with no more than minor trimmings or accessories of non-textile materials. *Swimways Corp. v. United States*, 329 F. Supp. 3d 1313, 1320-21 & n.11 (Ct. Int'l Trade 2018). It also means that a machine with a plastic component could be classified

as builders' ware of plastics—despite a chapter note excluding machines entirely. Note 2(s) to Chapter 39. Again, the government ignores these anomalies. Applying the GRIs in the correct order, however, leads to the logical result that all of Lutron's shade machines, regardless of the composition of their panels, are classifiable as machines of heading 8479.

But even if resort to GRI 3(b) were appropriate here (and it is not), Lutron's shade machines are *still* properly classified under heading 8479 because their EDUs provide the machines' essential character. They, unlike the panels, are the most expensive and indispensable component, drive customer purchases, and are constantly in operation.

The government's primary response is that the EDU does not visibly perform its function like the panel does. But the government once again ignores precedent. The essential-character test turns not on visibility but rather on essentiality. *Conair Corp. v. United States*, 29 C.I.T. 888, 897 (2005). And the EDU's role in relation to the function of the shade machine is undoubtedly essential, as without the EDU, the panel cannot deploy or retract to regulate light, heat, and security—just as a fountain does not have flowing water without its pump. *See id.*

At most, the panel is equally as essential to Lutron's shade machines as the EDU. And as the government once again concedes, that means that the shade machines are rightly classified under heading 8479 pursuant to GRI 3(c). Def. Br. at 20 n.13. Thus, whether the Court chooses to apply the government's skip-to-GRI 3(b) methodology, or instead applies the GRIs in order as precedent requires, the result is the same. All of Lutron's shade machines, regardless of panel composition, are machines of heading 8479. The Court should therefore grant judgment in Lutron's favor.

## ARGUMENT

### I. All of Lutron's Shade Machines are Rightly Classified Under Heading 8479 Pursuant to GRI 1, Regardless of Panel Composition

Lutron's shade machines are properly classified under heading 8479, which covers "[m]achines and mechanical appliances having individual functions, not elsewhere specified or included [in Chapter 84]." ECF No. 71 (Lutron Br.) at 18-23. Therefore, in order to be classified within heading 8479, merchandise must be a "machine," and that "machine" must have individual functions, *i.e.*, perform independently of other machines. As detailed in Lutron's motion for summary judgment, the subject merchandise consists of three families of shade machines, which in turn are made up of a variety of parts including bracketry, a tube, a panel, a hembar, and an EDU. Lutron Br. at 6-11. Each part has a definite function and transmits mechanical force. The bracketry attaches the shade machine to a wall or other structure and "provides mechanical grounding for the EDU"; the tube houses the EDU and "provides mechanical stiffness to support" the panel; the panel, which the government admits is a "component" of the shade machine and which can be made "with different materials, colors, styles, and opacities," "works with the EDU to be positioned in accordance with the effects desired by the user"; the hembar provides the "resistance needed to optimize the EDU's motion characteristics and efficiency profile" and "holds the panel flat and uniform as it is repositioned"; and the EDU intelligently and autonomously "controls the shade machines' operation through electromechanical means." *Id.*

More specifically, the EDU is the "brawn" and the "brains" of a shade machine, consisting of a printed circuit board assembly, gear train, and other electro-mechanical parts that give life to the autonomous machine and intelligently deploys and retracts the panel to regulate security, light, and heat. *Id.* at 8-11. To accomplish this function, the EDU accepts signals from

a multitude of inputs, converts electrical energy into mechanical energy, and applies that mechanical energy through each part of the machine, all the way down through the panel and the hembar. *Id.* at 8-9. The EDU also performs activities which have nothing to do with panel movement, such as **[[**[redacted]**]]** *Id.* at 9, 28. And while the shade machines' panels are undoubtedly important, it is the EDU that permits the shade machines to autonomously provide security, and control the flow of light, heat and views into an interior space. The shade machines therefore fit within the common meaning of the tariff terms "machines" or "mechanical appliances," because they are devices, with moving parts having definite functions, that apply mechanical or electrical power to perform a task. Additionally, the shade machines fit within heading 8479 because they have an "individual" function, as they autonomously perform their function of controlling the flow of light, heat, views, and so forth, without needing to be a part of some other, larger machine. *Id.* at 18-20.

Contrary to the government's suggestion (raised only in footnotes), Lutron's classification claim encompasses *all* of the shade machines contained in the entry at issue, not just some subset thereof. *See* Def. Br. at 12 n.10 (claiming, without citing any authority, that Lutron abandoned its claim as applied to shade machines containing plastic panels); *id.* at 2-3 n.6 (same, for disassembled shade machines). To start, "[a]rguments raised only in footnotes … are waived." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012). And in any event, there was no abandonment. Lutron's motion for summary judgment and statement of undisputed material facts, which note that panels can be made from different materials and discuss all the shade machines' parts, do not distinguish between shade machines with textile

panels, those with plastic panels, and those that entered disassembled. ECF No. 71-17 (Pl.'s SOF) ¶¶ 1, 4, 14-23; *see* Lutron Br. at 6 n.1, 31 (discussing parts of disassembled shade machines and shade machines with plastic panels). Between Lutron's complaint, discovery responses, and summary-judgment motion, the government was on notice that Lutron was contesting the classification of all shade machines in the subject entry regardless of panel composition—as evidenced by the government arguing over the classification of all shade machines in the subject entry in its cross-motion for summary judgment. *See generally* Def. Br.[1] The government's abandonment argument is thus waived and, in any event, meritless.

### A. The Government's Concessions Prove that Lutron's Shade Machines are Classifiable, in Their Entirety, as "Machines" or "Mechanical Appliances Having Individual Functions" of Heading 8479 Under GRI 1

The government's cross-motion makes it easy to resolve the shade machines' classification under GRI 1. The government concedes, as it must, that a "machine," as that term is used in heading 8479, is "a complex device, consisting of a number of interrelated parts, each having a definite function, together applying, using, or generating mechanical or (later) electrical power to perform a certain kind of work"; "an apparatus using or applying mechanical power and having several parts, each with a definite function and together performing a particular task[.]" Def. Br. at 22 (quoting various dictionary definitions). The government does not contest that the shade machines' components have "been selected and/or designed to contribute to the behavior of the system as a whole." Def.'s Resp. to Pl.'s SOF ¶ 14. The government also correctly concedes that the shade machines' EDU "is classifiable in heading 8479." Def. Br. at 9. And finally, the government again correctly concedes that the shade machine's "panel is a

[1] Lutron's GRI 3 argument initially focused on shade machines with textile panels because the government, in its interrogatory responses, limited its contentions to shade machines with textile panels by merely pointing to HQ H312768 (which does not mention heading 3925). ECF No. 70-13, Pl.'s Ex. 13 (Def.'s Interrog. Resp. at 11). But Lutron's arguments apply equally to shade machines with plastic panels, as the government does not dispute.

component of the machine," Def.'s Resp. to Pl.'s SOF ¶ 17, and that having a panel does not preclude classification under heading 8479. Def. Br. at 24. These concessions resolve this matter in Lutron's favor.

The government's own statements demonstrate that the shade machines are machines of heading 8479. Undisputedly, a machine consists of interrelated parts with their own definite functions. An EDU without a panel is a part of that machine classifiable in heading 8479. NY N013565 (July 24, 2007). The panel is another part of that machine, regardless of its material. The entire shade machine, including the panel that forms an interrelated part of it and performs a definite function, is therefore a machine of heading 8479. That is, each part of the shade machine has its own definite function which collectively contributes the individual function of the machine as a whole: the bracketry affixes the shade machine to a wall or other structure and "provides mechanical grounding for the EDU"; the tube houses the EDU and "provides mechanical stiffness to support" the panel; the panel "works with the EDU to be positioned in accordance with the effects desired by the user"; the hembar provides the "resistance needed to optimize the EDU's motion characteristics and efficiency profile" and "holds the panel flat and uniform as it is repositioned"; and the EDU intelligently and autonomously "controls the shade machines' operation through electromechanical means." Lutron Br. at 6-11. These several parts with definite functions work together to perform the clearly defined function of controlling an interior environment's light, heat, privacy, views, and aesthetics. *Id.* at 11-12.

To put another way: without a panel, a shade machine's EDU is a part of a machine, as the government has never disputed. With a panel, the EDU and panel together with all other parts (including the bracketry, tube, and hembar that the government largely ignores) become a completed shade machine that performs an individual function. This Court has routinely

classified machines consisting of separate yet interrelated parts contributing to the whole—"composite" goods, as the government deems them—as machines with individual functions of heading 8479. For example, in one case, this Court classified a laser sintering system "rely[ing] on an automated process" through which "a computer … directs a built-in laser" to melt particles "within a 'build chamber'" under heading 8479. *EOS of N. Am., Inc. v. United States*, 911 F. Supp. 2d 1311, 1314, 1324 (Ct. Int'l Trade 2013). In another case, this Court classified bioreactor systems "consist[ing] of three major components"—the "Bioreactor, the Controller, and the Actuator"—under heading 8479. *Applikon Biotechnology, Inc. v. United States*, 807 F. Supp. 2d 1323, 1324-32 (Ct. Int'l Trade 2011). These products were classified as machines *because* they have separate components that perform distinct yet complementary functions—not *in spite of* that fact. *See also Fuji Am. Corp. v. United States*, 519 F.3d 1355, 1356-59 (Fed. Cir. 2008) (affirming classification of "chip placers" made up of "[v]arious discrete units," "including a loading system," "a placement system," and "a parts recognition system," under heading 8479); *Rainin Instrument Co. v. United States*, 288 F. Supp. 2d 1360, 1363-69 (Ct. Int'l Trade 2003) (classifying pipettes "made up of a number of different mechanical parts, including plungers, pistons, adjusting dials," "tip ejectors," and "an adjustable micrometer," under heading 8479).

Perhaps to avoid its concessions, the government now claims that the shade machines somehow lack an "individual function" within the meaning of heading 8479, Def. Br. at 25-26, but this argument is unpersuasive. To start, the government provides no explanation of how the shade machines lack an "individual function" beyond *ipse dixit*. Def. Br. at 26 (suggesting that "simply position[ing] a textile or plastic shade panel over a window" should not count). The Court can thus reject the government's statement out of hand. But even accepting the

government's (untrue) premise that all a shade machine does is position a panel over a window, this counts as an "individual function" within the meaning of heading 8479. As Explanatory Note 84.79 points out, the machines of heading 8479 are "[m]echanical devices … *whose function can be performed distinctly from and independently of any other machine or appliance*." (Emphasis added.) In other words, a machine with an "individual function" is one that is not merely a part of a larger machine. This requirement presumably exists to distinguish between machines, on the one hand, and parts sufficiently complex to qualify as machines themselves, on the other. *See* Note 2 to Section XVI (setting forth rules for distinguishing between such goods). Yet nowhere does the government contend that a shade machine is merely a part of a larger machine. *See generally* Def. Br. Lutron's shade machines thus have an "individual function" within the meaning of heading 8479.

The government also suggests that the shade machines are *not* "machines" because blocking light is not "mechanical." Def. Br. at 23. That suggestion is confusing. For one, it is inconsistent with the concession that the EDU is classifiable in heading 8479. The EDU's purpose is to intelligently and autonomously control security, lighting, and heat by deploying and retracting the shade machine's panel. It is unclear how an EDU can be a part of a machine, but a shade machine consisting of an EDU and a panel (among other parts) is suddenly no longer a completed machine. The government's argument makes sense only by ignoring the EDU—a panel standing alone is not a machine—but that is not how tariff classification works. Merchandise must be classified according to "the condition in which it is imported," *Rico Import Co. v. United States*, 12 F.3d 1088, 1090 (Fed. Cir. 1993) (quoting *Worthington v. Robbins*, 139 U.S. 337, 341 (1891)), not the condition in which it is imagined.

For another, heading 8479 provides that machines must have an "individual" function—

not, as the government says, a "defining function" that can be thought of as "mechanical." Def. Br. at 23. The government's interpretation thus contradicts the heading's text. It also contradicts Explanatory Note 84.79, which provides that devices that humidify, dehumidify, or cool the air are covered by heading 8479. How humidifiers, dehumidifiers, and air coolers have a "defining function" that is "mechanical," the government does not say. This is because they do not. The machines of heading 8479 are "many and varied," Explanatory Note 84.79, and contrary to the government's view, include shade machines like Lutron's that "precisely, autonomously, and intelligently control the positioning of a panel via electromechanical means for a wide variety of purposes": "blocking views" to provide privacy, optimizing "heat gain or loss," increasing "energy efficiency," avoiding "glare," altering "acoustics," dividing "interior spaces," and protecting against "UV damage," among other things. Lutron Br. at 11-12.

### B. The Government Ignores Precedent Holding that Goods Made up of Multiple Materials or Parts are Still Classifiable Under GRI 1 and Espouses a Theory of Classification that Would Turn the Tariff Schedule on its Head

The government's primary argument against heading 8479 is that Lutron's shade machines are "composite goods" that cannot be classified under GRI 1. Def. Br. at 12-16. Lutron already explained in its motion for summary judgment why that argument fails. Lutron Br. at 21-22. Namely, "the mere fact that a piece of merchandise consists of more than one item or article does not necessarily make that merchandise … a 'composite good' subject to classification under GRI 3(b). GRI 3(b) applies only if no provision exists in the Harmonized System that provides for the … composite good *as a whole*." *Pomeroy Collection*, 559 F. Supp. 2d at 1391-92 (quotation and alterations omitted). Thus, the "problem with [the government's] argument is that it relies on GRI 3(b) analysis of composite goods when analysis under GRI 1 is not exhausted." *Second Nature Designs*, 660 F. Supp. 3d at 1378. And for the reasons just discussed, exhausting GRI 1 results in classification under heading 8479. The government

agrees that its preferred provisions, headings 6303 and 3925, do not describe the shade machines as a whole. Def. Br. at 13-16. But the entirety of the shade machine—EDU, panel and all—is described by heading 8479. *See also* Lutron Br. at 18-22.

Rather than engage with *Pomeroy Collection* or *Second Nature Designs*, the government ignores these decisions. *See* Def. Br. It instead cites *Home Depot U.S.A., Inc. v. United States*, 915 F.3d 1374 (Fed. Cir. 2019), *id.* at 14-15, but that case has little to do with this one. In *Home Depot*, there was no single heading describing the entirety of the merchandise at issue. As such, it was *prima facie* classifiable under two different provisions, each describing only half of the merchandise. 915 F.3d at 1377-80. In other words, the Federal Circuit exhausted GRI 1, determined that the two candidate headings described only part of the merchandise at issue, then proceeded to GRI 3. But this is not a case where *no* provision describes the shade machines in full. Here, one heading fits the bill: heading 8479, which broadly covers machines and other mechanical appliances and describes the shade machines in their entirety. *Home Depot* is thus inapposite.

Tellingly, no court has ever cited *Home Depot* for the proposition that the government purports to glean from it.[2] And that is because that proposition is inconsistent with decades of precedent, the GRIs, and the structure of the tariff schedule. *See Wilton Indus.*, 741 F.3d at 1266; *Second Nature Designs*, 660 F. Supp. at 1378-79; *Pomeroy Collection*, 559 F. Supp. 2d at

[2] The government has not been consistent in its approach for classifying purported "composite" goods. Although the government argues here that "composite" goods must be classified under GRI 3, it recently took the exact opposite position before the Federal Circuit. Specifically, the government argued *in favor* of GRI 1 and *against* GRI 3 where different parts of the merchandise could be classified in different headings. ECF No. 9 at 26 n.1, *Blue Sky the Color of Imagination, LLC v. United States*, No. 26-1854 (Fed. Cir. July 24, 2026); *see id.* at 33 ("Although Blue Sky finds significant the fact that there are calendar pages in the planner, that an item includes calendar pages does not make the product, as a whole, a calendar."). The government does not explain why it takes an inconsistent position here.

1391-92. Under the government's theory of tariff classification, all imported goods consisting of more than one material or part (that is, most imported goods) are "composite goods" that must be classified under GRI 3(b) from the outset. This theory obliterates GRI 1—which, after all, is designed to resolve most classification disputes, *ME Global, Inc. v. United States*, 633 F. Supp. 3d 1349, 1357 (Ct. Int'l Trade 2023)—and the carefully crafted structure of the HTSUS.

Take heading 6303, for instance. Heading 6303 falls within Subchapter 1 of Chapter 63, which "applies *only* to made up articles, *of any textile fabric*." Note 1 to Chapter 63 (emphasis added). The Explanatory Note to Chapter 63 clarifies that an article is not "of … textile fabric" where "the presence of [non-textile] materials constitutes more than mere trimming or accessories." *Swimways Corp.*, 329 F. Supp. 3d at 1320-21 & n.11 (quoting Explanatory Note 1 to Chapter 63). Thus, a pool float with some textile components, but significant non-textile components like a plastic bladder and steel spring, cannot be classified as a textile in chapter 63. *Id.* Under the government's theory, however, Note 1 to Chapter 63 and Explanatory Note to Chapter 63 are meaningless, and goods with significant non-textile components—including but not limited to motors, multi-stage gears, and printed circuit boards—can be classified in chapter 63 by calling the good "composite" and jumping to GRI 3. But "courts should construe the provisions of the tariff code in a way that avoids rendering terms redundant, meaningless, or inoperative." *ME Global*, 633 F. Supp. 3d at 1368. EDUs are not "mere trimming or accessories"—the government does not suggest otherwise, *see generally* Def. Br.—so the shade machines of which they form the essential part cannot be classified in a provision covering simply textiles.

The government's theory would do similar violence to Chapter 39. Heading 3925 covers "[b]uilders' ware of plastics, not elsewhere specified or included[.]" The government takes great

pains to discuss Note 11(f) to Chapter 39, which discusses "blinds," Def. Br. at 13, but entirely ignores Note 2(s), which provides that "machines and mechanical or electrical appliances" of "section XVI" are excluded from classification under any of Chapter 39's headings. Again, under the government's pick-and-choose methodology, limitations like "not elsewhere specified or included" and an exclusion for "machines" can simply be ignored—while other notes are inexplicably heeded—if the good is a "composite" one.

That methodology is all the more indefensible in this case because of the notes to section XVI. These notes set forth binding instructions for classifying machines under the headings covered by the section, including heading 8479. *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1376 (Fed. Cir. 2011). Specifically, "*[w]here a machine* (including a combination of machines) *consists of individual components* … intended to contribute together to a clearly defined function covered by one of the headings in chapter 84 …, then *the whole* falls to be classified in the heading appropriate to that function." Note 4 to Section XVI (emphasis added). As noted above, the shade machines consist of individual components—bracketry, tubes, panels, hembars, and EDUs—that each contribute to the clearly defined function of controlling an interior environment's light, heat, privacy, views, and aesthetics. Moreover, only "composite machines consisting of *two or more machines fitted together to form a whole*" are to be classified according to the component "which performs the principal function." Note 3 to Section XVI (emphasis added). But the panel is not itself a machine that would mandate a "principal function" analysis for "composite machines" under Note 3. Requiring a GRI 3 analysis from the outset, however, would blow past "the careful listing of" interpretive rules required by Notes 3 and 4 to Section XVI and render them "meaningless." *H. Reisman Corp. v. United States*, 17 C.I.T. 1260, 1264 (1993). Put another way, Notes 3 and 4 to Section XVI, in no uncertain terms,

preclude the government's "component" good approach to classification of machines like Lutron's.

In sum, the Court must apply the GRIs, headings, and notes as written, instead of applying them in a way that would render them "redundant, meaningless or inoperative." *ME Global*, 633 F. Supp. 3d at 1368. Applying GRI 1 here preserves the plain meaning of the tariff schedule and the careful textual guardrails it sets forth in its headings and notes, preventing the absurd result that complex machines like Lutron's could be classified in provisions covering fabric and plastic. For all these reasons, Lutron's shade machines are therefore classifiable as machines of heading 8479, and specifically, subheading 8479.89.95 ("Machines and mechanical appliances having individual functions, not specified or included elsewhere in this chapter: … [o]ther machines and mechanical appliances: … [o]ther: … [o]ther.").

## II. Even if GRI 3 Applied, Lutron's Shade Machines' EDUs Impart the Machines' Essential Character, Again Dictating Classification Under Heading 8479

GRI 1 resolves the classification of Lutron's shade machines because only one heading—heading 8479—describes the entirety of the product. Lutron Br. at 18-23. But even if it were necessary to resort to GRI 3(b) and an essential-character analysis, heading 8479 is still the correct classification. Under this analysis, the Court considers "the respective indispensability of the properties of the components of the merchandise, the respective cost of the components of the merchandise, the basis for a consumer's decision to purchase the merchandise," "the respective duration and/or frequency of the use of the components," *Toy Biz, Inc. v. United States*, 219 F. Supp. 2d 1289, 1301 n.15 (Ct. Int'l Trade 2002), "primary function," and "ordinary common sense," *Home Depot U.S.A., Inc. v. United States*, 427 F. Supp. 2d 1278, 1293 (Ct. Int'l Trade 2006). The EDU, which undisputedly falls under heading 8479, imparts the shade machines' essential character because it first and foremost defines the identity of the

merchandise as intelligent and autonomous machines, is responsible for their primary function, indispensable to that function, always in use, more expensive than any other component, and the reason why consumers not only choose to buy, but pay a premium to purchase the shade machines. Lutron Br. at 25-32.

The government's essential-character analysis, by contrast, declines to engage with the undisputed evidence supporting the essentiality of the EDU, admits that the EDU is in fact indispensable to the machines' operation, and relies on a "visibility" standard that this Court has already rejected.[3] The shade machines are thus classifiable under heading 8479 because their EDUs impart their essential character. And even if the government's arguments had some merit (they do not), the panel would at most be equally as essential to the shade machines as the EDU—which the government agrees means that the shade machines must be classified under heading 8479 pursuant to GRI 3(c).

### A. The Government Fails to Grapple With the Undisputed Evidence that the EDU, Unlike the Panel, is the Most Expensive Component, Drives Consumer Purchasing Decisions, and is Always in Operation

First, as discussed in Lutron's motion for summary judgment, the EDU is essential because it gives the shade machines their identity: among other things, it is "in use longer and more frequently than the panel," "cost[s] more than the panels" especially after accounting for research and development costs, and serves as "the basis for a consumer's decision to purchase the merchandise." Lutron Br. at 27-29. Rather than grapple with these undisputed facts, the government ignores them—or worse, tells the Court to ignore them.

---

[3] The government lists the non-exhaustive factors from the Explanatory Note to GRI 3(b) and cites *Home Depot* but tellingly omits many of the factors that *Home Depot* and other decisions have found important in the essential-character analysis. Def. Br. at 16-17. For example, the government cites *Home Depot*, 427 F. Supp. 2d at 1293, Def. Br. at 17, but does not mention that the Court found "ordinary common sense" relevant. Incidentally, the factors that the government leaves out of its discussion tend to be those that support the EDU's essentiality. *See, e.g.*, *Toy Biz*, 219 F. Supp. 2d at 1301 n.15.

Start with the fact that the EDU is in operation more than the panel because the EDU is constantly in use, even when the panel is not deployed. The EDU is continuously listening for and receiving input, sending information out, and performing other technological functions. Lutron Br. at 28. Nowhere in its GRI 3(b) analysis does the government address this point. *See* Def. Br. at 16-20. It is thus undisputed that this factor weighs in favor of the EDU being essential.

Next, consider the relative cost of the EDU. The government does not contest that the EDU "costs two to three times more than the panel and is covered by approximately seventy-five U.S. patents." Def. Br. at 19. Instead, it suggests that the "relative value is only one factor" that the Court should ignore in favor of another factor. *Id.* at 20. In other words, the government does not dispute that this factor weighs in favor of the EDU's essentiality, either.

Then there is the basis for a consumer's decision to purchase a Lutron shade machine. The government first complains about one of the evidentiary sources that Lutron cited for the fact that consumers buy Lutron's shade machines because of their EDUs' functionality, Def. Br. at 20, but this complaint falls flat. For one, contrary to what the government suggests, *id.*, the evidence Lutron submitted is a probative consumer survey: it provides insight as to "the high-end residential market," as well as the "key criteria" and "key advocates" involved in purchasing decisions in that market, and explains that Lutron's shade machines are "incredibly prized" by consumers because "they allow the owner to control the light and mood with the touch of a button." ECF No. 70-9, Pl.'s Ex. 9 at 2-3, 42. For another, the government ignores the other evidence that Lutron submitted establishing that "[t]he electromechanical components of Lutron's automated shades are the critical components that drive sales and prices." ECF No. 70-8, Pl.'s Ex. 8 (Johnson Report) at 5-6 ("Notably, panels do not drive the sales."); ECF No. 70-5,

Pl.'s Ex. 5 (Bull Dep.) at 102:11-19 ("most of our customers are going to use" shade machines for "autonomous, smart functionality," and that "has really been the determining factor why people choose these products").[4] And so, in the end, the government once more asks the Court to ignore this factor: "what drives a consumer's purchasing decision," the government says, "does not control essential character." The government thus does not dispute that yet another essential-character factor favors the EDU's essentiality.[5]

**B. The EDU is Indispensable to the Operation of the Shade Machine—as the Government Concedes**

With three factors already undisputedly favoring Lutron's position that the EDU imparts the shade machines' essential character, the government makes another concession: that the EDU is "[i]ndispensable to [t]he [o]peration of the [s]hade[.]" Def. Br. at 19. That is, the EDU is indispensable to deploying and retracting the panel for purposes of controlling light, heat, and security. Or, as Lutron put it in its motion for summary judgment, without the EDU, "panels could not retract or deploy at all, let alone autonomously," given that the panels "are manually inoperable and are not designed or intended to deploy or retract without the EDU." Lutron Br. at 27. But this means that the EDU is at least as indispensable as the panel. *Home Depot U.S.A.,*

[4] The government objects to all of Lutron's expert evidence on the ground that it is "unsworn" and "is hearsay." *See* Def.'s Resp. to Pl.'s SOF at 17. This copy-and-paste objection is puzzling because, apart from the government providing no explanation as to why the evidence would be hearsay, each expert report is preceded by a declaration from the expert who wrote the report declaring "under penalty of perjury" that the report "fully and accurately sets forth" the expert's opinions and findings, and that the expert "would testify competently to these opinions and findings and their basis" if called as a witness. ECF No. 70-8, Pl.'s Ex. 8 at 1; *see* ECF No. 70-2, Pl.'s Ex. 2 at 1.

[5] The government also states that "Lutron has not provided a single legal authority to support its argument" on this point. Def. Br. at 20. That statement is not accurate. Lutron Br. at 26 (quoting *Toy Biz*, 219 F. Supp. 2d at 1301 n.15, which lists "the basis for a consumer's decision to purchase the merchandise" as a factor in the essential-character analysis); *see Conair*, 29 C.I.T. at 897 ("This examination leads to the conclusion that consumers would not purchase the Serenity Ponds for the purpose of enjoying the visual aspects of the plastic sculpture.").

*Inc. v. United States*, 435 F. Supp. 3d 1311, 1323 (Ct. Int'l Trade 2020) ("[O]ne component can impart the article's essential character even if two components are both indispensable to the use of the article."). Without the EDU, light, heat, and visibility cannot be controlled at all. *See Conair*, 29 C.I.T. at 897 ("While the plastic component contributes to the manner in which the water flows, and thus to the Serenity Ponds' auditory and visual appeal, without the pump the water doesn't flow at all.").

The government believes that there is a distinction to be made between being indispensable to "the *operation* of the *shade*" and being indispensable to "the *function* of the *shade*." Def. Br. at 19 (emphasis added). The EDU, according to the government, "changes only how the shade is positioned; it is not what the shade does." *Id.* at 18.[6] But the test is not whether the two components at issue are indispensable to *each other's* operation or function but rather whether the components are indispensable to the *subject merchandise's* operation or function. *Home Depot U.S.A., Inc. v. United States*, 491 F.3d 1334, 1336-37 (Fed. Cir. 2007) ("the role of a constituent material in relation to the use of the goods," not in relation to the other constituent materials, is an essential-character factor). And the distinction between "operation" and "function" that the government tries to draw is confusing at best. The panel is not what

[6] The government cites the testimony of its "expert," Dr. Srinivasan, "with respect to the role of the shade panel" in an attempt to bolster its argument. Def. Br. at 18. "While expert testimony can be useful for explaining to the trier of fact what they otherwise could not understand, it is not needed or useful where the question at issue is one that a person of usual discernment could decide and where the subject of expert testimony can and does speak for itself." *G.G. Marck & Assocs., Inc. v. United States*, 2015 WL 3757040, at *9 (Ct. Int'l Trade June 17, 2015) (quotation and alteration omitted).

Dr. Srinivasan's testimony is inadmissible because it is unhelpful. For one, he "was only asked to opine on the shade material," not the shade machine in its entirety. ECF No. 81-6, Def. Ex. D., Deposition of Dr. Ravi Srinivasan at 94:24-95:4. For another, the testimony that the government cites merely states that the panel can block light. *Id.* at 92:1-3. "[A] person of usual discernment"—even unusually poor discernment—"does not need the assistance of an expert to" figure that out. *G.G. Marck & Assocs., Inc.*, 2015 WL 3757040, at *10.

controls light, heat, view, and security, just as wheels are not what make a car move. The EDU controls light, heat, view, and security by deploying or retracting the panel as needed, just as an engine is what makes a car move by providing rotational torque to the wheels. *See Conair*, 29 C.I.T. at 897.

### C. This Court has Already Rejected the Government's "Visibility" Test for Essential Character

Instead of engaging with all of the essential-character factors, the government contends that the shade machines' panels impart the essential character largely because the panels are the visible part of the machines that can be seen and touched. Def. Br. at 17-19. But this Court has already rejected the government's "visibility" test for what component imparts a good's essential character.

In *Conair*, the Court addressed the classification of plastic decorative sculptures with water pumps called "Serenity Ponds." In arguing that the plastic sculpture imparted the goods' essential character, the government emphasized that the water pump was "not visible to the consumer" and that it was "the plastic components of the article that [were] visible and aesthetically appealing to a consumer." 29 C.I.T. at 896 (quoting the government's brief). The Court disagreed. "To the extent that the Serenity Ponds succeed in creating [a] tranquil atmosphere, it is necessarily the water flowing over the simulated landscape that stimulates the visual and auditory senses," and thus such an atmosphere is "present only when the pump is transporting water[.]" *Id.* "Although the pump may not be visible, it is nonetheless indispensable to making the merchandise what it is." *Id.* at 897 (quotation omitted). And "[w]hile the plastic component contributes to the manner in which the water flows, … without the pump the water doesn't flow at all." *Id.*

Accordingly, it did not matter in *Conair* that the plastic sculpture was the largest,

bulkiest, most visible part of the Serenity Ponds, given the importance of the pump. And the same is true here. Although the shade machines' panels are undoubtedly important, the shade machines' function is to *autonomously control* the flow of light, heat and views into an interior space. That function is only accomplished through the EDU, which deploys or retracts the panel as needed to accomplish the desired interior environment—just as the Serenity Ponds' desired aesthetic was accomplished by the pump that caused water to flow over the sculpture.

The only way to make sense of the government's position is to accept its unsupported refrain that the Court should ignore the EDU and the evidence and treat the shade machine as if it were simply "a window shade." Def. Br. at 17. But it is black letter law that merchandise must be classified in its condition as imported. *Rico Import*, 12 F.3d at 1090. The subject merchandise is not simply a window shade, just as the merchandise in *Conair* was not simply a plastic sculpture. Window shades do not have intelligent, autonomous features. They are incapable of two-way communication. They do not have printed circuit board assemblies. They do not have EDUs. They do not sense humidity. They do not store data. Lutron's shade machines cannot, in short, be reduced to just their panels. The veteran national import specialist with years of experience classifying machines put it in common-sense terms: "if you just wanted to close the drapes, why purchase all this other equipment? You want extra sophisticated equipment so you can close the drapes at programmed times. You might not be there, but you want the drapes closed. … I said to myself, 'A shade has got to be cheaper than all this mechanical equipment.' When you look at the engineering drawings and you see all the mechanics. To me, the fabric … would be much cheaper." ECF No. 70-14, Pl.'s Ex. 14, Deposition of Patricia O'Donnell at 83:20-85:23.

Taking into account all of the essential-character factors, including those that the

government ignores, the shade machines' EDUs impart their essential character. Because the EDU is classifiable under heading 8479, the shade machines are therefore classifiable under the same heading pursuant to GRI 3(b), and specifically subheading 8479.89.95.

### D. At Most, The Panel is Equally as Essential as the EDU, Requiring Classification Under Heading 8479 Pursuant to GRI 3(c)

Assuming that the panel is "essential" to the shade machine, it is at most *equally* essential given the EDU's indispensability, cost, constant operation, and driving of consumer purchasing decisions. Indeed, most of the essential-character factors weigh in favor of the EDU's essentiality. The government concedes, as it must, that this still results in the shade machines being classified under heading 8479 pursuant to GRI 3(c). "If the Court reaches GRI 3(c), the Government concedes that heading 8479, HTSUS, would be the proper heading as it is the last heading in numerical order." Def. Br. at 20 n.13. Thus, no matter which way classification is decided, whether under GRI 1, GRI 3(b), or GRI 3(c), Lutron's shade machines are machines of heading 8479—just as was Customs' position for over a decade before Section 301 duties became available under the government's preferred classification.

## CONCLUSION

For these reasons, the Court should grant Lutron's motion for summary judgment, deny the government's cross-motion for summary judgment, grant judgment in Lutron's favor, and order U.S. Customs and Border Protection to reliquidate the subject entry of shade machines under subheading 8479.89.95.

Dated: September 9, 2026

/s/ Luke Mathers
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-0160
lmathers@strtrade.com

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing submission complies with the word-limitation set forth int Standard Chambers Procedure 2(B)(1), and contains 6,993 words.

Dated: September 9, 2026

/s/ Luke Mathers
Luke Mathers